**Teresa BOGGS, et al., Plaintiffs,**

v.

**DIVESTED ATOMIC CORPORATION, et al., Defendants.**

**No. C–2–90–840.**

United States District Court, S.D. Ohio, E.D.

Nov. 7, 1991.

Roger L. Clark, Stephen C. Rodeheffer, Margaret B. Apel, Kimble, Stevens, Clark & Rodeheffer, Portsmouth, Ohio, Stanley M. Chesley, and Louise M. Roselle, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, Ohio, for plaintiffs.

Edgar A. Strause, and Thomas B. Ridgley, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for defendants.

## OPINION AND ORDER

KINNEARY, District Judge.

### I. INTRODUCTION

Teresa Boggs, a resident of Lucasville, Ohio, lives within six miles of the Portsmouth Gaseous Diffusion Plant. The plant, which is located in rural Pike County, Ohio, approximately four miles from the town of Piketon, processes radioactive materials for the United States Department of Energy. It began operating in the early 1950's and has continuously produced enriched uranium since that time.

Ms. Boggs and the other named plaintiffs, residents of either Pike or Scioto Counties who also live within six miles of the plant, claim that they and their properties have been exposed to radioactive materials and non-radioactive hazardous wastes emitted from the Portsmouth plant. They have asked this Court to certify a class of all similarly-situated persons in order that they may present, on a classwide basis, claims for emotional distress, diminution in the value of their real property, medical monitoring for early cancer detection, and injunctive relief against further unlawful emissions of hazardous substances from the plant. The parties have exhaustively briefed the class certification motion, filed numerous depositions, and presented extensive oral argument to the Court on October 3, 1991. For the following reasons, plaintiffs' motion to certify a class consisting of all persons who live, rent, or own property within a six-mile radius of the boundaries of the Portsmouth Gaseous diffusion plant will be granted.

### II. FACTUAL BACKGROUND

The first amended complaint identifies eight individuals as representative of the following class of plaintiffs:

"All persons, firms, or entities who were residents, property owners or lessees of property within a radius of six miles from the boundary of the Portsmouth Gaseous Plant ("the Portsmouth Plant"), which proximity caused such persons and property to be subject to the harmful effects of airborne particulates and run-off water from defendants' operations at the Portsmouth Plant."

Although eight class representatives are identified in the first amended complaint, only six of those are designated in the motion for class certification as class representatives: Teresa Boggs, of Lucasville, Ohio; Sarah Chandler, Ellen Ison, and Carol Jenkins, of Piketon, Ohio; Wayne Chandler, of Beaver, Ohio; and Karen Scott, of Jasper, Ohio. The named defendants are Divested Atomic Corporation, which, along with its predecessor, Goodyear Atomic Corporation, operated the plant until November 16, 1986, and Martin Marietta Energy Systems, which has operated the plant after that date. Goodyear Tire & Rubber, which is the parent company of Divested Atomic, is also a defendant.

Although the parties have submitted a great deal of factual material, and defendants argued the facts of the case at length, there are relatively few facts that are crucial to class certification. Essentially, the facts can be subdivided into two categories: those relating to class definition (that is, evidence that something occurred to distinguish the members of the class from the general public), and to class size. The balance of the issues raised by this motion are primarily, if not completely, legal ones.

#### A. *Class Definition.*

The plaintiffs define the class as all persons living within a six mile radius of the boundaries of the Portsmouth Plant whose

persons or property have been exposed to radioactive or hazardous wastes released from the plant. The defendants claim that this definition of the class is improper because, in their view, it requires the court to decide that each person living within this geographic area, or owning property within it, has suffered some actual injury from exposure to hazardous or radioactive wastes. According to defendants, a trial on the merits would be needed in order to identify persons with actionable injuries. Defendants also argue strenuously that no proposed class member has suffered a legally cognizable injury because there is no proof that anyone living close to the plant has received more than a miniscule, and medically insignificant, additional dose of radiation. They have included this argument in a recently-filed summary judgment motion.

Plaintiffs argue that defendants misapprehend the definition of the class. They agree that whether certain people have actionable injuries from exposure is a merits issue. However, for purposes of class membership, they assert that it is the *fact of exposure*, in some amount, rather than proof of a compensable injury that is important. The inquiry then becomes whatever plaintiffs have shown that emissions of potentially harmful materials, without yet deciding what is a harmful quantity of such materials, reasonably may have reached persons and property within a six-mile radius of the plant. In other words, the Court must ask two questions: (1) is there any evidence that the plant has discharged radioactive or hazardous substances beyond its borders? And (2) if so, have those substances travelled up to six miles? The present record suggests the answers to both questions is yes.

### 1. Emissions

The parties agree that, from time to time, radioactive materials have escaped into the air and have left the boundaries of the plant. Although defendants downplay the significance of these releases, they do not deny that some have occurred.

For example, a report dated June 9, 1978, and prepared by Goodyear Atomic Corpora-

tion, refers to "[u]ranium lost to airborne and waterborne effluent points...." It notes an increase in uranium lost from airborne effluent from 1975 to 1977, and also describes a liquid effluent loss of uranium and uranium "daughters" (i.e. other radioactive elements such as thorium and protactinium which are produced through natural radioactive decay of uranium). The report also shows releases of technetium, a fission product, beginning in 1975. Finally, it notes that only "sparse radiological data were accumulated before 1968," implying the possibility of undetected or unmeasured releases before that time.

Next, according to a Department of Energy Investigative Report issued on June 1, 1978, a 14-ton cylinder containing uranium hexaflouride, a radioactive compound, fell from a "straddle carrier" on March 7, 1978. The cylinder ruptured, and 21,125 pounds of the compound, in gaseous form, escaped. Investigations determined that cylinders had been dropped before, and that this was not the first time that radioactive gas had escaped as a result. Investigators concluded that an airborne plume of gas crossed the boundaries of the plant, and that about 1,500 pounds of uranium was released through the west drainage ditch. They did not believe that any harmful level of exposure had been reached, although there was a report of a fish kill in the west drainage ditch.

It also appears that some amount of radioactive material is discharged from routine plant operations. For example, Geoffrey Sea, a former plant employee, described in deposition testimony the operation of "purge vents" through which radioactive materials were released. Thus, for purposes of this class action motion, plaintiffs have proved that radioactive materials have left the plant site.

### 2. Dispersion

The fact that radioactive materials have escaped the confines of the plant is, by itself, not sufficient to justify defining the class to include everyone who lives or owns property within six miles of the plant's boundaries. Although the class definition is subject to refinement based upon further

development of the record, and can be expanded or contracted if the facts so warrant, there should be some evidence at this stage of the case that plaintiffs' definition is reasonable. This requires an examination of plaintiffs' evidence of the dispersion of hazardous emissions.

One of plaintiffs' experts, Bernd Franke, testified at deposition that people in the vicinity of the Portsmouth plant "have been exposed to radiation on top of what their natural background is." He stated that released radioactive materials did not stop at the six-mile boundary, but that "certainly doses within a six-mile radius are larger than doses outside of a six-mile radius."

Again, defendants' argument is not focused on the fact of dispersion of radioactive substances, but on the amount and effect of such dispersion. Defendants argue that neither lifetime nor annual doses of radiation to class members, attributable to the Portsmouth plant are significant enough to cause either a reasonable risk of health effects or any loss of property value. They also note that plaintiffs have done no market studies on real property values. These are merits issues. With regard to exposure, defendants' experts prepared charts which purport to show the amount of radiation that the "average" class member (using plaintiffs' definition) has been exposed to as a result of emissions from the plant. Although these amounts are, in defendants' eyes, minimal compared with radiation doses received from smoking cigarettes or flying coast-to-coast in a commercial airliner, it appears that persons living within six miles of the plant can reasonably be said to have been exposed to some level of radioactive materials originating inside the plant's boundaries and can thereby be differentiated from more distant members of the public. Clearly, if persons in the vicinity have been so exposed, real property has been also. Consequently, the Court concludes that plaintiffs' choice of a six-mile distance to define class members bears a reasonable relationship to the evidence of record at this point, and that the definition of the class is sufficiently definite to permit

analysis of the Rule 23 factors governing class certification.

### B. *Class size*

The only other factual issue relates to the size of the class. Factually, this becomes an issue only if exposure to "harmful" levels of radiation is made a part of the class definition. Otherwise, it is apparent that well in excess of a thousand persons, and perhaps between four thousand and five thousand, now live within six miles of the plant. It is reasonable to infer that there has been some sale of property and residential relocation between the early 1950's and today. It cannot seriously be disputed that plaintiffs' class definition fits thousands if not tens of thousands of people. Although plaintiffs' counsel may be required, at some point and for purposes of giving notice, not only to determine the precise size of the class but the names and addresses of all the members, it is sufficient for certification purposes to conclude that the class numbers in the thousands and that there is some geographic dispersion of class members. Factually, both elements are present here. The Court now turns to a discussion of the legal significance of these facts in the context of the requirements of Rule 23.

### III. DISCUSSION

■ The Sixth Circuit requires a district court carefully to consider whether the requirements of Rule 23 are satisfied prior to certifying a class. *Shipp v. Memphis Area Office, Tenn. Department of Employment*, 581 F.2d 1167 (6th Cir.1978); *Alexander v. Aero Lodge No. 735, Intern. Ass'n of Machinists and Aerospace Workers, AFL–CIO*, 565 F.2d 1364 (6th Cir. 1977); *Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir.1976).

■ The Court has broad discretion in determining whether an action is mantainable as a class action. *Kentucky Educators Public Affairs Council v. Kentucky Registry of Election Finance*, 677 F.2d 1125, 1135 (6th Cir.1982), *citing Ott v. Speedwriting Publishing Company*, 518 F.2d 1143 (6th Cir.1975), although that discre-

tion must be exercised within the framework of Rule 23. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981); *Califano v. Yamasaki*, 442 U.S. 682, 703, 99 S.Ct. 2545, 2558–59, 61 L.Ed.2d 176 (1979). The party seeking certification as a class has the burden of establishing the prerequisites. *Senter*, 532 F.2d at 522; *Akron Center for Reproductive Health v. Rosen*, 110 F.R.D. 576, 580 (N.D.Ohio 1986); *Basile v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 105 F.R.D. 506, 507 (S.D.Ohio 1985). To meet this burden, plaintiffs must show that all four of the prerequisites of Rule 23(a) are satisfied, and then must demonstrate that the class falls within one of the subcategories of Rule 23(b). *Senter*, 532 F.2d at 522; *Basile*, 105 F.R.D. at 507.

The Court will now discuss separately each of the prerequisites for class certification under Rule 23(a), and will then determine whether, if those prerequisites have been met, certification of a class under one or more of the subdivisions of Rule 23(b) is appropriate.

It is worth noting that, while the Court will undertake a detailed and individualized evaluation of each class action prerequisite in this case, it finds generally persuasive the well-reasoned and thorough opinion of Judge Spiegel in *In Re Fernald Litigation*, Case No. C–1–85–149 (S.D.Ohio, September 8, 1986) (*"Fernald"*). Given the factual and legal similarity of this case and the *Fernald* case, this Court will draw liberally from Judge Spiegel's analysis where appropriate.

### A. *Numerosity*

■ Fed.R.Civ.P. 23(a) requires plaintiffs to show first that "the class is so numerous that joinder of all members is impracticable...." Fed.R.Civ.P. 23(a)(1). There is no bright line numerical test by which the district court can determine when the numerosity requirement is satisfied, and the Sixth Circuit has noted that a class does not require any specific number of members: "Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. General*

*Motors Corp.*, 532 F.2d 511 (6th Cir.1976); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131 (1st Cir.1985), *cert. denied* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). The key to determining whether the numerosity requirement of Rule 23(a)(1) is satisfied rests on the impracticability of joining potential class members. Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required. *See Arkansas Educ. Ass'n v. Board of Educ. of Portland*, 446 F.2d 763 (8th Cir.1971); *Samuel v. University of Pittsburgh*, 56 F.R.D. 435 (W.D.Pa.1971). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

■ Plaintiffs, through the evidence cited above relating to the size of the class and dispersion of radioactive materials originating from the plant, have made a strong *prima facie* showing that there are too many potential plaintiffs to be joined in one lawsuit. The Court has already concluded that defendants' focus on the number of persons who have been harmed by exposure to radioactive emissions is a merits argument, essentially unrelated to the issue of class certification because of the way in which the class has been defined. For the same reason, defendants' reliance on *In re Three Mile Island Litigation*, 95 F.R.D. 164 (M.D.Pa.1982) is misplaced.

The precise issue before the Court in the cited *Three Mile Island* case was whether the class of tourist-dependent businesses which suffered economic loss as a result of the Three Mile Island incident was sufficiently large to satisfy the numerosity requirement. In denying certification, the Court noted that the plaintiffs' own definition of the class included the aspect of economic harm, rather than simply proximity to the reactor, and searched the record in vain for proof that the number of businesses with economic reversals following the incident was so large that they could

not all join the case as plaintiffs. There, the potential class size was only in the hundreds, and the record was insufficient to show how many of those businesses suffered, or believed they suffered, because of the incident. Here, by contrast, the potential class size is in the thousands, and the class definition does not include the element of actual injury, only exposure. *Three Mile Island* is therefore not persuasive authority. Following the general principles recited above, the Court finds this class too numerous to make joinder of all its members in a single lawsuit to be practicable. Thus, the required numerosity showing has been made. *See also Fernald, supra,* at 9–11.

### B. *Commonality*

■ Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class...." Unlike Rule 23(b)(3), which also requires that such common questions predominate over individual questions, the existence of significant common legal or factual issues is enough to satisfy Rule 23(a)(2)'s threshold commonality requirement. That requirement is undisputedly met here.

Plaintiffs have identified a substantial number of common questions, both factual and legal, including: (1) how extensive were the emissions from the plant; (2) what caused them; (3) were they foreseeable, (4) what precautions to avoid emissions were taken, or can be taken; (5) what is the economic impact of emissions; and (6) can the defendants be held liable under theories of strict liability, negligence, private nuisance, or willful and wanton misconduct. Defendants have not argued that these questions are not fairly raised by the pleadings, or that they are not common to the class members' claims. The Court has no difficulty in concluding that the commonality requirement has been satisfied.

### C. *Typicality*

■ Rule 23(a)(3) requires the claims of the class representative to be "typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). The typicality requirement focuses on the type of injury suffered by the class members and the interests of the various class members. *See Senter,* 532 F.2d at 525. The commonality and typicality requirements are closely related in that they each serve to assist in the determination whether the claim of the named plaintiff and those of the class are so interrelated that the interests of the absent class members will be protected. *General Telephone Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982).

■ The named plaintiffs have advanced two distinct types of claims arising out of a larger variety of legal theories: (1) that their personal well-being has been affected by exposure to radioactive material, so that they reasonably fear the onset of cancer or other diseases and reasonably require medical monitoring; and (2) that their property interests have been damaged by contamination, affecting their ability to sell their realty for a price unaffected by a purchaser's knowledge of such contamination or apprehension about the safety of living on property near the plant. No named plaintiff has asserted a claim that any specific disease, either physical or mental (other than apprehensiveness about future diseases), had been caused by exposure to radioactive or other hazardous materials emanating from the plant, nor has any named plaintiff yet asserted a claim for property damage that is different in kind or amount from other named plaintiffs or class members, notwithstanding the different types of real property involved (e.g. commercial, residential, agricultural), differences in sources of potential contamination (e.g. airborne, waterborne, or both), or differences in proximity to or direction from the plant. All of these claims rest on common legal theories of federal statutory violations, strict liability, negligence, private nuisance, and willful or wanton misconduct.

Defendants' arguments stress the many individual differences which exist both among named plaintiffs and between the named plaintiffs as a group and the balance of the class. They have filed transcripts of the depositions of the named plaintiffs, and note that each plaintiff's life-

style differs in terms of exposure to potential carcinogens and susceptibility to emotional injury. They also point out that levels of exposure cannot be uniform throughout the six-mile area, and that the sources and types of contaminants differ. Finally, they argue that damage claims—which, in their view, are the primary if not only substantial claims in this case—are inherently individualized and therefore atypical. With these differences, defendants claim that the typicality requirement has not and cannot be met.

Defendants rely on *Sanna v. Delta Airlines*, 132 F.R.D. 47 (N.D.Ohio 1990) for the proposition that "[courts] have been hesitant to find 'emotional injuries' typical." *Id.* at 50. However, the *Sanna* court also noted that such claims may be typical if they stem from a common event, such as the collapse of the skywalk in the Kansas City Hyatt Hotel lobby, and cited with approval a case which certified a class where the damage claims of each plaintiff were obviously different. *In re Asbestos School Litigation*, 104 F.R.D. 422 (E.D.Pa. 1984). As that court noted, differences in the situation of each plaintiff or each class member do not necessarily defeat typicality: "The harm suffered by the named plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered *is of the same type.*" *Id.* at 430, *citing McQuilken v. A & R Development Corp.*, 576 F.Supp. 1023, 1029 (E.D.Pa.1983).

■ Rule 23 provides for a procedural device which allows a district court to achieve efficiencies in the adjudication of similar claims. Its touchstones are fairness and efficiency—the same goals underlying the Federal Rules of Civil Procedure as a whole. The requirements of both Rules 23(a) and 23(b) are, in large measure, benchmarks to be used in evaluating the efficiency and fairness of trying certain types of claims either jointly or separately, and many of them have common theoretical underpinnings. For example, commonality and typicality are closely related, and both are part of an overall inquiry that includes

the Rule 23(b) test of whether common issues predominate in the action.

In the latter context, the Sixth Circuit has stated that "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Co.*, 855 F.2d 1188, 1197 (6th Cir.1988). That case, like this one, involved a claim by neighbors of a hazardous industrial facility that renegade materials from the facility had contaminated their properties. Although individualized issues existed, the conduct allegedly giving rise to liability was identical for each plaintiff and class member. The Court noted that "where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." *Id.*

■ These statements apply directly to the typicality issue presented in this case. Clearly, people and parcels of real property, like snowflakes, necessarily have different and unique characteristics. The important question is to what extent those differences, when compared to the nature and extent of the shared characteristics of the named plaintiffs' and the class members' claims, will defeat the Court's ability to achieve a considerable efficiency through collective adjudication of those claims. Here, as in *Sterling*, notwithstanding the differences, class treatment is clearly a better way to proceed.

Counsel have taken great pains to minimize individual differences, and heighten typicality, by presenting only certain types of claims. No individualized medical claims have been pleaded. No business injury is alleged, even though some class members undoubtedly conduct business ventures on their properties. Plaintiffs have not attempted to affix liability on a single event or emission, such as the 1978 uranium hexaflouride release, which might have impacted one geographic area more than others,

but have placed the entire course of operation of the plant and its lifetime emissions into issue. Rather than asking exclusively for money damages, they have also prayed for common forms of relief, including medical monitoring and injunctive relief concerning the plant's continued operation. These claims are common to all members and are typical of each, notwithstanding the fact that each named plaintiff may verbalize his or her subjective fears differently or have a different level of awareness about when emissions occurred, how they manifested themselves, or what elements or compounds were involved. Thus, the typicality requirement has also been satisfied. *See also Fernald, supra,* at 14–15.

### D. *Adequacy of Representation*

Finally, plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). Criteria for assessing the adequacy of representation include whether the plaintiff has common interests with the class members and whether the representative will vigorously prosecute the interests of the class through qualified counsel. *Senter,* 532 F.2d at 524–25. A factor in determining the vigor of representation concerns the representatives' resources to investigate class claims and to contact other class members. *See Bowen v. General Motors Corp. A.C. Spark Plug Div.,* 542 F.Supp. 94, 100–02 (N.D.Ohio 1981); *Ingram v. Joe Conrad Chevrolet, Inc.,* 90 F.R.D. 129,132 (E.D.Ky.1981).

Although defendants have made a number of arguments addressing this prerequisite, extensive discussion is not needed. Clearly, counsel in this case are eminently qualified to prepare the case for trial and to try it. Defendants do not dispute that. Thus, the only question presented is whether the named plaintiffs suffer from some infirmity that makes them unsuited to act as class representatives.

Defendants assert that they have "unique" defenses to the claims of each named plaintiff, and that these defenses cut against these plaintiffs' ability adequately to represent the interests of absent class members. Those defenses are identified as follows. Some named plaintiffs recently moved into the class area; none have incurred environmental cleanup or "response" costs; none have had environmental testing performed; none have been treated for emotional distress. According to defendants, these matters render the named plaintiffs' federal statutory claims subject to dismissal, may impact adversely their property damage claims, and may significantly undercut their assertions of severe emotional distress.

The central problem with defendants' arguments is that none of these defenses are unique to the named plaintiffs. It is unlikely that any significant number of class members have incurred response costs, including environmental studies or clean-up expenses. Few have likely sought treatment for emotional distress. The time when class members purchased property near the plant undoubtedly varies, and to the extent that the named plaintiffs' dates of purchase also vary, that makes their claims more, rather than less, representative of the claims of the class as a whole. In short, the named plaintiffs have asserted claims both typical of the other class members, and subject to typical defenses. Since there is no suggestion that other factors have caused or may cause conflict between the named plaintiffs and other class members, the named plaintiffs adequately represent the interests of the class as a whole, and the requirements of Rule 23(a)(4) have also been satisfied.

### E. *Rule 23(b)*

Plaintiffs have argued for class certification under almost all of the separate subtests found in Rule 23(b). Focusing on their claims for injunctive relief, they argue that either a 23(b)(1) or 23(b)(2) class is appropriate because there is a real risk of inconsistent adjudications, and because the defendants have acted in a way common to all class members, so that injunctive relief with respect to the class as a whole is appropriate. They also assert that a 23(b)(3) class could be certified because the common issues identified above do predominate, and a class action is clearly a superior

way—indeed, the only possible way—to adjudicate these claims.

■ Defendants' argument against certification of any class under Rule 23(b) is twofold. First, both in their briefs and at oral argument, defendants insist that plaintiffs truly seek only a monetary award, and that their claims for injunctive relief are either insubstantial or poorly-disguised money damage items. That being the case, certification under Rules 23(b)(1) and 23(b)(2) is unavailable. Turning then to Rule 23(b)(3), defendants reiterate their position that individual issues dominate this case, so that no efficiency would be achieved by consolidating these claims in one judiciary proceeding.

As is evident from the discussion to this point, the Court has rejected defendants' view of the individualized nature of the plaintiffs' claims. Common issues of liability, causation, and remedies not only predominate but overwhelm individualized issues. If these claims were tried separately, the amount of repetition would be manifestly unjustified. To the extent that each claim of each plaintiff depends upon proof concerning the history of operations at the plant, the nature, timing, extent and cause of emissions, the kinds of remedies, if any, appropriate to address potential future emissions, the need for medical monitoring, are the generalized impact of the plant's operations on real property values, that proof would be virtually identical in each case. It would be neither efficient nor fair to anyone, including defendants, to force multiple trials to hear the same evidence and decide the same issues. Clearly, a Rule 23(b)(3) class could properly be certified under these circumstances.

■ A 23(b)(3) class, however, allows class members to opt out of the action if they desire. As Judge Spiegel noted in *Fernald*, if there is a real risk of inconsistent adjudications which would subject the defendants to incompatible standards of conduct, the Court should consider certifying a 23(b)(1) class to prevent the possibility of multiple actions being filed. Thus, the Court will also examine this case under Rule 23(b)(1)(A).

Plaintiffs' argue that all of their requests for remediation—plant cleanup, for example, medical monitoring or nuisance abatement—can only be handled by a single judicial order. If multiple courts addressed those issues, they could well order defendants to take actions that could not be performed consistently with each other, thus forcing defendants to choose which orders to obey and which to disregard under threat of contempt.

Defendants discount the probability of truly inconsistent adjudications, claiming that any court order would direct them simply to comply with all applicable laws, and that multiple orders to that effect would not be inconsistent. Although Rule 23(b)(1)(A) does embody a policy of protecting a defendant from the dilemma of complying with inconsistent standards of conduct—a protection these defendants seem not to want—it also allows a single court to fashion an appropriate remedy, and to bring a controversy to a final and complete resolution. In addition, this Court, as did Judge Spiegel in *Fernald*, perceives the threat of inconsistent adjudication to be real. *See Fernald*, at 18. Any remedy ordered would not be so simplistic as defendants suggest. If plaintiffs can show an entitlement to injunctive relief, it would undoubtedly be in the form of a complex order, addressing many specific features of plant operation. It is unlikely that two different courts would tailor a remedial order in the same fashion, and it is therefore entirely conceivable that different remedial orders would contain incompatible provisions. Therefore, a 23(b)(1)(A) class can also be certified. Since the (b)(1)(A) class is more comprehensive, the Court will certify a class under that subsection.

## IV. CONCLUSION

It is therefore ORDERED that plaintiffs' motion for class certification is GRANTED. A class is hereby CERTIFIED under F.R.Civ.P. 23(b)(1)(A) consisting of:

"All persons, firms, or entities who were residents, property owners or lessees of property within a radius of six miles from the boundary of the Portsmouth

Gaseous Plant ("the Portsmouth Plant"), which proximity caused such persons and property to be subject to the harmful effects of airborne particulates and run-off water from defendants' operations at the Portsmouth Plant."