[No. S088458. Mar. 3, 2003.]

LOCKHEED MARTIN CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
ROSLYN CARRILLO et al., Real Parties in Interest.

BAUMAC CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
ROSLYN CARRILLO, Real Party in Interest.

PETRO-TEX CHEMICAL CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
ROSLYN CARRILLO et al., Real Parties in Interest.

**COUNSEL**

Holme, Roberts & Owen, Linnea Brown; Gibson, Dunn & Crutcher, Robert S. Warren, Robert W. Loewen and Daniel S. Floyd for Petitioners Lockheed Martin Corporation and Highland Supply Corporation.

Payne & Fears, David Sweet, Alan G. Ross; Law Offices of Terry Bridges and Terry Bridges for Petitioner Highland Supply Company.

Bowman & Brooke, Anthony S. Thomas; Seyfarth, Shaw, Fairweather & Geraldson, John D. Dwyer, Steven B. Katz and Carrie L. Daughters for Petitioner FMC Corporation.

Wood, Smith, Henning & Berman, David F. Wood, Ann G. Zuckerman, James C. MacDonald; Brunick, Alvarez & Battesby and Leland P. McElhaney for Petitioner Baumac Corporation.

Zevnik Horton Guibord McGovern Palmer & Fognani, John D. Fognani, Michael John Miguel and K. Eric Adair for Petitioners PETRO-TEX Chemical Corporation and El Paso Tennessee Pipeline Co.

Nossman, Guthner, Knox & Elliott and Patrick J. Richard as Amici Curiae on behalf of Petitioners.

Hugh F. Young, Jr., and Harvey M. Grossman for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Petitioners.

Atlantic Legal Foundation and Martin S. Kaufman for Ronald E. Gots, Leonard Hamilton, Ronald Hart, Clark W. Heath, Michael Gough, A. Alan Moghissi, Rodney W. Nichols, Frederick Seitz, Barry H. Smith, James Wilson and Richard Wilson as Amici Curiae on behalf of Petitioners.

Crowell & Moring, Victor E. Schwartz and Luther Zeigler for The Coalition for Asbestos Justice, Inc., as Amicus Curiae on behalf of Petitioners.

Horvitz & Levy, David M. Axelrad, Lisa Perrochet and Mary-Christine Sungaila for American Chemistry Council, Chemical Industry Council of California, ExxonMobil Corporation and Union Oil Company of California as Amici Curiae on behalf of Petitioners.

Sedgwick, Detert, Moran & Arnold and Frederick D. Baker for Defense Research Institute as Amicus Curiae on behalf of Petitioners.

Spriggs & Hollingsworth, Donald W. Fowler, Rebecca A. Womeldorf, Marc S. Mayerson; National Chamber Litigation Center and Robin S. Conrad for United States Chamber of Commerce as Amicus Curiae on behalf of Petitioners.

Robie & Matthai, Pamela E. Dunn and Natalie A. Kouyoumdjian for State Farm General Insurance Company and United Services Automobile Association as Amici Curiae on behalf of Petitioners.

Crosby, Heafey, Roach & May, James C. Martin, Michael K. Brown; Daniel J. Popeo and Paul D. Kamenar for Washington Legal Foundation as Amicus Curiae on behalf of Petitioners Lockheed Martin Corporation and Highland Supply Company.

No appearance for Respondent.

Engstrom, Lipscomb & Lack, Walter J. Lack, Gary A. Praglin, Richard P. Kinnan; Masry & Vititoe, Edward S. Masry; Girardi & Keese, Thomas V. Girardi, Howard B. Miller; Ward & Ward and Alexandra S. Ward for Real Parties in Interest.

## OPINION

**WERDEGAR, J.**—In this action for medical monitoring of the residents of a geographic area affected by defendants' toxic chemical discharge, the question before us is whether plaintiffs, in moving for class certification, have met their burden of demonstrating that common issues of law and fact predominate. We conclude they have not. We therefore affirm the judgment of the Court of Appeal.

### BACKGROUND

Plaintiffs Roslyn Carrillo et alia allege that defendants Lockheed Martin Corporation et alia, in the course of conducting manufacturing operations in the City of Redlands, beginning in 1954, discharged dangerous chemicals that contaminated the city's drinking water with harmful toxins and that this contaminated water was used by a large portion of the city's residents. In December 1996, on behalf of themselves and persons similarly situated, plaintiffs filed this action in the San Bernardino County Superior Court.

Plaintiffs pray that the court order defendants to fund a court-supervised program for the medical monitoring of class members, and for punitive damages.

Plaintiffs moved for certification of a "medical monitoring" class and a "punitive damage" class, defined identically as "People who were exposed to water contaminated with any of the following chemicals: TCE, PCE, TCA, other solvents, Ammonium Perchlorate, Perchlorate, other unknown rocket fuel components and rocket fuel decomposition products, Beryllium, Carbon Tetrachloride, Vinyl Chloride, Hydrazine (and Hydrazine derivatives), Nitrosamines (and Nitrosamine derivatives), Epoxides (and Epoxide derivatives), Triazines (and Triazine derivatives), at levels at or in excess of the dose equivalent of the MCL (Maximum Contaminant Level),[1] or in excess of the safe dose where there is no MCL, for some part of a day, for greater than 50% of a year, for one or more years from 1955 to the present" within specified geographical limits. (Fns. omitted.) Plaintiffs' class definition indicated that review of relevant water quality documents was ongoing and that the definition would be amended if additional chemicals were identified.

One of plaintiffs' attorneys declared that estimating the number of persons in the class was difficult, because the University of Redlands is located within the specified geographic boundaries, and persons residing, working or studying within the defined area may qualify as class members. The attorney's best estimate was that the class includes between 50,000 and 100,000 people.

The trial court certified the classes, finding that plaintiffs had met their burden of proof under Code of Civil Procedure section 382: "The Court finds that the plaintiffs have a realistic chance of success on the merits. [¶] Specifically, the Court finds that the plaintiffs have shown that there is a realistic chance that the defendants caused contaminants to be leaked into the water table beneath Redlands and that this contaminated water was served to the members of the proposed class." The court also found that there is an ascertainable class, concluding it was "not necessary to determine the levels of toxins received by each plaintiff at this time and that the geographic limits placed on the class are reasonable and related to the alleged contamination." The court concluded, finally, that members of the class have a well-defined community of interest and that common questions of law and fact predominate in the action.

Parties objecting to certification filed three writ petitions in the Court of Appeal, which that court consolidated. Opining that individual issues raised

---

[1]A measure based on the health dangers posed by oral ingestion of contaminated water developed by the California Department of Health Services.

by plaintiffs' claims "clearly predominate, making class certification inappropriate," the Court of Appeal granted a writ of mandate directing the trial court to vacate its order certifying the classes. We granted plaintiffs' petition for review.

DISCUSSION

### I. Suitability of Medical Monitoring Claims for Class Treatment[2]

We first addressed the availability of medical monitoring as a form of damages in *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795] (*Potter*). There, residents of homes located near a landfill at which the dumping of toxic substances was prohibited brought, as individual claimants, an action against a tire manufacturing company that had dumped toxic waste materials, alleging that their water supply had thereby been contaminated. The plaintiffs sought damages for, inter alia, fear of cancer and the costs of medical monitoring. (See *id.* at pp. 975-979.) ■ Recognizing that " 'expenditures for prospective medical testing and evaluation, which would be unnecessary if the particular plaintiff had not been wrongfully exposed,' " are " 'detriment proximately caused' " by negligent disposal of toxic substances (*id.* at p. 1005 & fn. 24, quoting Civ. Code, § 3333), we held that "the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable" (*Potter*, *supra*, at p. 1009).

"In determining the reasonableness and necessity of monitoring," we stated, "the following factors [(hereafter the *Potter* factors)] are relevant: (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis." (*Potter*, *supra*, 6 Cal.4th at p. 1009.)

■ We have not previously addressed the prerequisites for class treatment of medical monitoring claims. ■ "Section 382 of the Code of Civil Procedure authorizes class suits in California when 'the question is one of a common or general interest, of many persons, or when the parties are

---

[2]Seven justices join this part of the opinion.

numerous, and it is impracticable to bring them all before the court.' The burden is on the party seeking certification to establish the existence of both an ascertainable class and a well-defined community of interest among the class members." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913 [103 Cal.Rptr.2d 320, 15 P.3d 1071] (*Washington Mutual*).)[3]

Plaintiffs assert that separate litigation of each class member's medical monitoring claim would unnecessarily consume vast judicial resources and time. They also urge us to repudiate the Court of Appeal's suggestion that the presence of individual issues generally precludes class certification in mass toxic exposure cases, arguing any such categorical foreclosure would render our decision in *Potter* meaningless. Defendants, on the other hand, emphasize that *Potter*'s proximate cause rationale for recognizing medical monitoring costs as damages logically extends only to such "increased or different monitoring" (*Potter, supra,* 6 Cal.4th at p. 1009, fn. 27) as a defendant's conduct actually necessitates. In light of their due process right to litigate each individual plaintiff's actual toxic dosage and relevant personal characteristics, defendants argue, individual issues in the case predominate over common ones, such that the community of interest required for class certification is lacking.

The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439-440 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).) "The community of interest requirement [for class certification] embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) Plaintiffs acknowledge it is their burden to establish the requisite community of interest and that "the proponent of certification must show, inter alia, that questions of law or fact common to the class predominate over the questions affecting the individual members." (*Washington Mutual, supra,* 24 Cal.4th at p. 913.)

"The ultimate question in every case of this type is whether . . . the issues which may be jointly tried, when compared with those requiring

---

[3]Code of Civil Procedure section 382 provides, in its entirety: "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants." (*Collins v. Rocha* (1972) 7 Cal.3d 232, 238 [102 Cal.Rptr. 1, 497 P.2d 225]; see also *Linder, supra,* 23 Cal.4th at p. 435.)

Defendants point to our statement that the *Potter* factors comprise "substantial evidentiary burdens" for plaintiffs (*Potter, supra,* 6 Cal.4th at p. 1009), as if to suggest the factors constitute novel proof requirements applicable only in medical monitoring cases. Not so. *Potter* recognizes "not a separate tort but simply an item of damages that cannot be awarded until liability is established under a traditional tort theory." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 914, fn. 18 [55 Cal.Rptr.2d 724, 920 P.2d 669], citing *Potter, supra,* at pp. 1006-1007.) So to observe does not gainsay the high court's observation that "limitations and cautions [like the *Potter* factors are] important—and integral—parts of the state-court decisions that permit asymptomatic plaintiffs a separate tort claim for medical monitoring costs." (*Metro-North Commuter R. Co. v. Buckley* (1997) 521 U.S. 424, 444 [117 S.Ct. 2113, 2124, 138 L.Ed.2d 560]; see also *id.* at pp. 440-441 [117 S.Ct. at pp. 2122-2123], citing, inter alia, *Potter, supra,* at p. 1010, fn. 28.)

As defendants acknowledge, *Potter* simply specified for the medical monitoring context the traditional requirement that a plaintiff prove causation of damage. Thus, while in *Potter* we "ma[de] it clear that the monitoring must be 'additional or different' " than that previously required (*Gutierrez v. Cassiar Mining Corp.* (1998) 64 Cal.App.4th 148, 156 [75 Cal.Rptr.2d 132]), we just as clearly stated that "if additional or different tests and examinations are necessitated as a result of the toxic exposure caused by the defendant, then the defendant bears full responsibility for their costs" (*Potter, supra,* 6 Cal.4th at p. 1012, fn. 31).

Defendants assert that "the required proof under *Potter*" includes "that each of the elements of the claims asserted on behalf of proposed class members, and all applicable defenses, are capable of common proof." Again, not so. We consistently have recognized, before and after *Potter,* that "the fact that each member of the class must prove his [or her] separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].)[4]

In sum, no per se or categorical bar exists to a court's finding medical monitoring claims appropriate for class treatment, so long as any individual

---

[4]Defendants also assert that their having pled an affirmative defense of untimeliness makes class certification inappropriate. Notice is the only individual issue defendants identify as

issues the claims present are manageable. Accordingly, we shall review the certification ruling before us in light of the established standards for class certification generally.

## II. *Plaintiffs Demonstrated Presence of Some Common Issues*[5]

As indicated, in granting plaintiffs' certification motion, the trial court expressly found that common questions predominate and determined that any individual issues that might arise at the time of trial are manageable. "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder, supra,* 23 Cal.4th at p. 435.) Nevertheless, "we must examine the trial court's reasons for [granting] class certification." (*Id.* at p. 436; see also *Washington Mutual, supra,* 24 Cal.4th at p. 914.) In particular, we must consider whether the record contains substantial evidence to support the trial court's predominance finding, as a certification ruling not supported by substantial evidence cannot stand. (*Linder, supra,* at pp. 435-436; see also *Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d at p. 470.)

At the outset, the record reveals that plaintiffs' claims sound generally in negligence, entailing proof of the "well-known elements of any negligence cause of action, viz., duty, breach of duty, proximate cause and damages." (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].)[6] Addressing whether questions common to the class predominate over questions affecting members individually, therefore, required the trial court to consider these elements.

Whether defendants in disposing of their chemical wastes owed a duty of care to the class members, i.e., to the persons who lived for the specified period within the specified geographical area, is a question of law for the court. (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) Defendants proffer no reason why a court would need to engage in individualized analysis in order to answer that question. The trial court rationally could conclude that the duty element of plaintiffs' claims will be susceptible of common proof.

---

being raised by that defense, however; i.e., they assert that when each plaintiff received actual notice of his or her claim will vary from individual to individual. No California court has declined to certify a class action specifically because of a statute of limitations defense. Defendants ultimately concede the point, calling "noncontroversial" the proposition that a limitations defense does not categorically preclude class certification.

[5]Seven justices join this part of the opinion.

[6]The operative fifth amended complaint purports to state causes of action for negligence, negligence per se, strict liability for ultrahazardous activity, declaratory relief, and injunctive relief.

Additionally, how and when defendants disposed of toxic chemicals and whether defendants' conduct was negligent are, as the Court of Appeal recognized, significant common issues of fact in this case. The parties already have presented extensive evidence (including well sampling and other hydrological data) about the pattern and degree of contamination of Redlands groundwater with various chemicals and the potential health consequences to humans of exposure to those chemicals. Defendants have conceded that common issues are present in the case because defendants' acts allegedly are the same with regard to each plaintiff. Thus, the record also contains substantial evidence supporting the conclusion that the breach of duty element of plaintiffs' claims will be susceptible of common proof.[7]

As noted, when first recognizing the medical monitoring remedy in *Potter*, we focused on the causation and damages elements of such claims, stating that in order to recover plaintiffs must demonstrate, through reliable medical expert testimony, both that the need for future monitoring is a "reasonably certain consequence" of toxic exposure and that the monitoring sought is "reasonable." (*Potter, supra*, 6 Cal.4th at p. 1009.) Defendants take the position that plaintiffs in moving for class certification have failed to demonstrate either that the causation ("reasonably certain consequence") or the damages ("reasonable" monitoring) elements of their medical monitoring claims will be susceptible of common proof.

Plaintiffs clearly are in a position to address some aspects of causation and damages on a class basis. Defendants concede, for example, that "the toxicity of the chemicals" allegedly discharged and "the seriousness of [any] disease for which the plaintiff is at risk"—both factors discussed in *Potter, supra*, 6 Cal.4th at page 1009—would be susceptible of common proof. And as the Court of Appeal noted, "the amount of contaminants that entered the groundwater; and, when, where, and at what levels were contaminants pumped by the city's wells entered into the domestic water system" are significant common issues of fact in this case.

Plaintiffs contend that, on the theory of liability they intend to present, each individual's exact dosage of each discharged chemical will not be relevant. According to expert testimony already in the record, plaintiffs argue, "anyone living or working in the area of contamination for at least six months has a plausible claim for medical monitoring." Class membership, plaintiffs stress, is restricted by definition to persons who have received a specified "medically significant" minimum dosage "for some part of a day,

---

[7]As the Court of Appeal recognized, moreover, whether defendants' conduct was malicious or otherwise such as to justify an award of punitive damages is a significant common issue of fact in the case.

for greater than 50% of a year, for one or more years from 1955 to the present" within specified geographical boundaries. All who meet that definition, plaintiffs propose to prove, "will require a generalized monitoring program for the diseases caused by such exposure." On such a theory, plaintiffs argue, specific individual dosages above the specified minimum are not relevant and, therefore, "the significance and extent" of toxic exposure (*Potter, supra*, 6 Cal.4th at p. 1009) will involve largely common proof.

The trial court in ruling on the certification motion apparently took plaintiffs' minimum dosage liability theory into account, stating that "proof of the [actual] dosage received [by each plaintiff] is not necessary at this time." Strictly speaking, that is correct, as in ruling on certification a court does not "ask whether [plaintiffs'] action is legally or factually meritorious." (*Linder, supra*, 23 Cal.4th at pp. 439-440.) Moreover, nothing in *Potter* precludes liability premised on a theory that a defendant's negligence has necessitated increased or different monitoring for all, or nearly all, exposed individuals, as long as the need is "a reasonably certain consequence of the exposure." (*Potter, supra*, 6 Cal.4th at p. 1006.) That a class of water consumers could, under particularly egregious circumstances, demonstrate that everyone who drank from a polluted municipal water system over a specified period is at significant risk for having received a dose sufficient to cause serious disease and, therefore, needs special monitoring, is not inconceivable. Thus, on an appropriate theory, even dosage issues may be susceptible of common proof.

### III. *Plaintiffs Failed to Demonstrate Common Issues Predominate*

██ Plaintiffs' burden on moving for class certification, however, is not merely to show that some common issues exist, but, rather, to place substantial evidence in the record that common issues *predominate*. (*Washington Mutual, supra*, 24 Cal.4th at p. 913.) As we previously have explained, "this means 'each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.' " (*Id.* at pp. 913-914, quoting *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 460 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].)

While the record on certification undoubtedly contains substantial evidence that many Redlands residents were exposed to toxic chemicals during the class period, evidence of exposure alone cannot support a finding that

medical monitoring is a reasonably necessary response. (*Potter, supra,* 6 Cal.4th at p. 1009.) As defendants emphasize, that all plaintiffs exposed to Redlands water received identical *dosages* of any toxic chemicals it contained is unlikely. On the one hand, duration of exposure to polluted water will vary among class members, as the class would include numerous people who lived in Redlands for a relatively short period of time during the more than 40-year class period. On the other hand, as the Court of Appeal observed, severity of exposure among class members may vary according to the amount of water they used.

Examination of the instant record reveals that plaintiffs have not provided substantial evidence that they are in a position to resolve possible dosage issues with common proof. Each class member's actual toxic dosage would remain relevant to some degree even if plaintiffs' "minimum dosage" liability theory ultimately were to prove viable. Membership in the class as plaintiffs have defined it requires, not merely exposure to water contaminated with one or more of the chemicals listed in the definition, but exposure "at levels at or in excess of the dose equivalent of the MCL (Maximum Contaminant Level), or in excess of the safe dose where there is no MCL" for at least the defined minimum period of time. (Fns. omitted.) But plaintiffs' experts did not unqualifiedly opine that all who resided in Redlands for the defined period likely received such dosages. Dr. Dahlgren was "asked to *assume* that there [was] a clinically significant exposure to these chemicals among members of a group that is geographically defined as residing within Redlands." (Italics added.) And Dr. Teitelbaum's opinion that "risk of disease due to the toxins is spread over the whole exposed population" was qualified with the observation that "[t]he outcome of the exposure . . . is determined by many factors including the dose, and the genetic makeup of the target individual."

Moreover, regardless of how a particular medical monitoring class might be defined, a plaintiff must demonstrate that "the need for future monitoring is a reasonably certain consequence of [the] toxic exposure" (*Potter, supra,* 6 Cal.4th at p. 1009), i.e., that the plaintiff faces a "significant but not necessarily likely risk of serious disease" (*id.* at pp. 1008-1009). For the following reasons, we conclude plaintiffs have not placed in the record sufficient evidence to warrant the trial court's concluding that they are likely to be able to make that demonstration with common proof.

Plaintiffs' class definition refers to at least 12 different toxic substances, and plaintiffs contend that, as a consequence of defendants' toxic dumping, each class member now requires special monitoring for numerous potential medical conditions. In linking their class definition to the toxic dumping and

water pollution evidence submitted in support of the certification motion, plaintiffs relied primarily on the testimony of two medical experts, Dr. James Dahlgren and Dr. Daniel Teitelbaum. ■ We previously have held that reliable medical expert testimony may establish the reasonableness and necessity of medical monitoring. (*Potter, supra,* 6 Cal.4th at p. 1009.) "Expert medical opinion, however, does not always constitute substantial evidence . . . ." (*Place v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378 [90 Cal.Rptr. 424, 475 P.2d 656]; see, e.g., *Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 40 [210 Cal.Rptr. 762, 694 P.2d 1134] [medical malpractice action]; *Kerr v. Bock* (1971) 5 Cal.3d 321, 324 [95 Cal.Rptr. 788, 486 P.2d 684] [res ipsa loquitur case]; *Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928] [disability apportionment appeal].) No reason appears why in the medical monitoring context we should depart from our settled understanding that "[a]n expert's opinion which rests upon guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence" (*Garza v. Workmen's Comp. App. Bd* (1970) 3 Cal.3d 312, 318, fn. 3 [90 Cal.Rptr. 355, 475 P.2d 451]).

■ Dr. Dahlgren testified in conclusionary fashion that "[a]ll persons who are at risk . . . should be in [a] monitoring program." He testified generally that "chemical exposure in Redlands has resulted in an excess of certain cancers" and "[e]arly diagnosis and treatment for these cancers would improve the prospect of cure or long term remissions," but he acknowledged that "[t]he precise dose of exposure experienced by each person *cannot be determined* exactly because of variability in the delivery of the water." (Italics added.) He also conceded that "safe levels of exposure in such a setting *are not known* precisely . . . ." (Italics added.)

Dr. Teitelbaum opined that "any person who fulfills the class definition proposed in this case is at greater risk of developing cancer and other serious illness which is known by medical scientists and toxicologists to be associated with the chemicals at issue in this case." But neither Dr. Dahlgren nor Dr. Teitelbaum categorically stated that mere qualification under the class definition demonstrates a need for medical monitoring irrespective of actual chemical dosages received.

We previously have noted that courts confronting medical monitoring claims may consider "the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease" (*Potter, supra,* 6 Cal.4th at p. 1009). Indisputably, a member of the

public's chances of developing any particular disease would be susceptible to common proof, but each individual plaintiff's chances of developing that particular disease, had he or she not been exposed as alleged, may not be.

Taken as a whole, the medical expert testimony plaintiffs presented in support of their motion for class certification is too qualified, tentative and conclusionary to constitute substantial evidence that plaintiffs, by adopting a liability theory that makes actual dosages and variations in individual response irrelevant, will be able to prove causation and damages by common evidence. As the record stands, therefore, the causation and damages issues raised by plaintiffs' claims must be counted among those that would be litigated individually, even if the matter were to proceed on a class basis. Especially when considered in light of the trial court's finding that the class consists of an estimated 50,000 to 100,000 people, that conclusion fatally undermines the trial court's predominance calculation.

In light of the foregoing, we conclude that the trial court's predominance finding is not supported by the record. The questions respecting each individual class member's right to recover that would remain following any class judgment appear so numerous and substantial as to render any efficiencies attainable through joint trial of common issues insufficient, as a matter of law, to make a class action certified on such a basis advantageous to the judicial process and the litigants. (*Washington Mutual, supra,* 24 Cal.4th at pp. 913-914.)

IV.   *Conclusion*

Although the Court of Appeal erred to the extent it stated or implied that no action in which plaintiffs seek medical monitoring as a remedy may ever appropriately be certified for class treatment, we agree with the court that the trial court abused its discretion in granting the instant certification motion. (*Linder, supra,* 23 Cal.4th at pp. 435-436.)

DISPOSITION

The judgment of the Court of Appeal is affirmed.

Kennard, J., concurred.

**BROWN, J.,** Concurring.—  I agree that there is "no per se or categorical bar" to the class treatment of medical monitoring claims (lead opn., *ante,* at p. 1105), and that there are some common issues (see lead opn., *ante,* at pp. 1106-1108). I also agree that "the trial court

abused its discretion in granting the instant certification motion" because plaintiffs failed to establish that the common issues predominate. (*Id.* at p. 1111.) Thus, I join in parts I and II of the lead opinion and its disposition. I, however, cannot join part III of the lead opinion because it fails to adequately convey the complexity of plaintiffs' claims and, as a result, fails to acknowledge many of the individual issues that must be resolved in order to decide the proposed class action. Indeed, upon considering the full breadth of plaintiffs' claims in light of the record, I do not believe any court could reasonably conclude that they are suitable for class treatment.

I

To fully appreciate the complexity of plaintiffs' proposed class action, I recount in greater detail the relevant facts.

In 1954, Grand Central Rocket Company (GCRC) constructed a facility used for the production, testing and disposal of rocket propellants (the rocket facility) in the Redlands/Crafton area. In 1958, defendant Petro-Tex Chemical Corporation (Petro-Tex)—which was jointly owned by defendants Food Machinery and Chemical Corporation (FMC) and Tennessee Gas Transmission Corporation (now El Paso Tennessee Pipeline Co.; Tenneco)—acquired GCRC and the rocket facility. In a series of transactions from 1960 to 1961, defendant Lockheed Martin Corporation (Lockheed) acquired GCRC and the facility. Lockheed manufactured, assembled and tested solid fuel rockets at the facility—which covered approximately 400 acres—until 1974. From the opening of the rocket facility in 1954 to its closing in 1974, these defendants discharged toxic substances throughout the facility's 400-acre property and contaminated the water used by surrounding residents.

In 1979, Lockheed leased 66 acres of the property to Seven W Enterprises, Inc. (Seven W). Seven W then acquired another 24 acres of adjacent property from the City of Redlands and constructed an industrial park. Since the creation of this park, tenants—specifically, defendants Baumac Corporation (Baumac), Highland Supply Corporation (Highland) and Palco Communications, Inc. (Palco)—have discharged toxic substances around the park and further contaminated the water used by surrounding residents.

As a result of this discharge of toxic substances, plaintiffs filed this class action against seven defendants—Petro-Tex, FMC, Tenneco, Lockheed, Baumac, Highland and Palco. Plaintiffs did not seek compensatory damages. Instead, they limited their recovery to "[s]pecial damages . . . to establish a fund for periodic medical monitoring and medical testing for each Plaintiff and Class member" and "punitive and exemplary damages." Consistent with

this limitation, plaintiffs identified two potential classes—a medical monitoring class and a punitive damages class.

In their motion to certify, plaintiffs defined the class as "[p]eople who were exposed to water contaminated with" certain toxic substances "at levels at or in excess of the dose equivalent of the MCL (Maximum Contaminant Level), or in excess of the safe dose where there is no MCL, for some part of a day, for greater than 50% of a year, for one or more years from 1955 to the present, within" certain "geographical boundaries" which encompassed the City of Redlands. Plaintiffs estimated the class contained 50,000 to 100,000 members and identified over 12 toxic substances discharged by defendants, including TCE, PCE, TCA, ammonium perchlorate, perchlorate, beryllium, carbon tetrachloride, vinyl chloride, hydrazine (and hydrazine derivatives), nitrosamines (and nitrosamine derivatives), epoxides (and epoxide derivatives) and triazines (and triazine derivatives). Plaintiffs also identified over 40 different medical conditions that may require medical monitoring due to exposure to those substances.[1]

The trial court certified both the medical monitoring and punitive damages classes. The Court of Appeal reversed, concluding that the individual issues raised by plaintiffs' claims "clearly predominate" over the common issues.

## II

Plaintiffs seek to certify a class consisting of all people exposed to a specified dose of one of at least *12 different* toxic substances for a certain period of time from *1955 to the present*, within a geographical area encompassing the City of Redlands. They allege that each class member—estimated to number *50,000 to 100,000*—may require medical monitoring for *over 40 medical conditions*. Plaintiffs seek to recover medical monitoring damages from *seven different defendants* that dumped these chemicals in

---

[1]According to plaintiffs, exposure to these substances may increase the risk for developing the following medical conditions: "1. Cancer of all types. 2. Respiratory effects including asthma, COPD, rhinitis, sinusitis, and bronchitis. 3. Neurological deficits including headache syndromes, encephalopathy, neuropathy, movement disorders, color blindness, learning disabilities and emotion lability. 4. Reproductive damage including sperm damage, miscarriages, infertility and birth defects. 5. Immunologic problems including scleroderma, systemic lupus, erythematosis, rheumatoid arthritis, Raynaud's phenomenon, inflammatory bowel disease, mixed connective tissue disease and fibromyalgia. 6. Neuroendocrine dysregulation including hypothyroidism, menstrual irregularities, decreased libido, chronic fatigue syndrome and multiple chemical sensitivity. 7. Psychiatric problems including post traumatic stress disorder, depression and anxiety. 8. Skin problems including eczema, chloracne, contact dermatitis, defatting dermatitis and allergic dermatitis. 9. Cardiac effects including arteriosclerosis, dysrhythmias, cardiac malformations and cardiomyopathy. 10. Hematologic damage including thrombocytopenia, anemia and leukopenia."

*various locations on a 400-plus-acre property* over a time period of *40-plus years.* Given the size and complexity of these class claims, I do not believe a court could reasonably conclude that the common issues predominate and certify the proposed class.

"[T]he cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1009 [25 Cal.Rptr.2d 550, 863 P.2d 795] (*Potter*).) Under this standard, a plaintiff may not obtain medical monitoring "based 'solely upon a showing of an increased but unquantified risk resulting from exposure to toxic chemicals.'" (*Ibid.*) Rather, "toxic exposure plaintiffs may recover '*only if* the evidence establishes the necessity, as a direct consequence of the exposure in issue, for specific monitoring *beyond that which an individual should pursue as a matter of general good sense and foresight.*'" (*Ibid.*, italics added.) The availability of monitoring therefore depends on the *particular* need of a *particular* plaintiff. (See *ibid.*)

Thus, a member of plaintiffs' proposed class may obtain medical monitoring damages for a medical condition only if that member's exposure to the chemicals dumped by defendants necessitate more monitoring than he or she would otherwise need. (See *Potter, supra,* 6 Cal.4th at p. 1009.) To order additional medical monitoring, a trier of fact must therefore determine (1) the extent of monitoring that the class member would have required for that medical condition absent exposure; and (2) whether the class member needs any additional monitoring due to exposure to the substances discharged by defendants.

Applying this standard of causation, the majority concludes that "the medical expert testimony plaintiffs presented in support of their motion for class certification is too qualified, tentative and conclusionary to constitute substantial evidence that plaintiffs, by adopting a liability theory that makes actual dosages and variations in individual response irrelevant, will be able to prove causation and damages by common evidence." (Lead opn., *ante,* at p. 1111.) In reaching this conclusion, the majority focuses on plaintiffs' failure to show that dosages issues and the need for medical monitoring are susceptible to common proof. (See lead opn., *ante,* at pp. 1109-1111.) I agree with the majority so far as it goes. But the majority fails to fully consider the extraordinary complexity of plaintiffs' claims in its analysis and, as a result, understates the deficiencies of plaintiff's showing in support of class certification.

As a threshold matter, determining each defendant's liability to the class for medical monitoring damages requires the resolution of a staggering number of complex individual issues. First, determining the extent of monitoring required by each class member absent exposure poses a highly individualized inquiry. A class member's risk of developing a medical condition depends on numerous factors unique to that member, such as age, gender, lifestyle, fitness, preexisting conditions, exposure to hazardous substances not released by defendants, etc. Given that plaintiffs identify over 40 medical conditions that may necessitate additional monitoring for approximately 50,000 to 100,000 individuals, the number and complexity of these individual determinations is overwhelming.

Second, determining whether each class member requires additional monitoring due to exposure requires individual litigation of numerous and substantial questions. A class member's need for additional monitoring hinges on the particular traits or characteristics of each class member. As plaintiffs' own experts acknowledge, human reaction to environmental and other hazards varies from individual to individual. It is directly affected not only by the individual's dosage or extent of exposure, but also by preexisting conditions, genetic makeup, age, gender, size, nutrition, adaptation and acclimatization to geographic and climatological factors, lifestyle, family history, social history, occupational history and personal health history. Thus, whether an individual class member needs additional medical monitoring depends heavily on numerous factors specific to that individual—and not just the dosage of toxic substances received. Moreover, the clinical value of early detection and diagnosis may vary significantly depending on the medical condition at issue and the individual characteristics of each class member. Given the number of hazardous substances involved, the number of medical conditions implicated, and the size of the class, resolution of the many individual issues necessary to establish each individual class member's entitlement to additional monitoring due to exposure would be a herculean task. Because determining "the basic issue of defendant[s'] liability to the purported class" requires the resolution of countless issues specific to each class member, class treatment is not appropriate. (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 463 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223] (*City of San Jose*).)

Aside from the individualized inquiries necessary to establish liability, the individualized inquiries necessary to establish the extent of additional medical monitoring required by those class members who prove liability are also numerous and substantial. To determine the extent of monitoring required, the court would have to ascertain the significance and extent of each member's exposure to the chemicals dumped by defendants. Because of the

number of chemicals involved, their potential synergistic effects, the duration of dumping, the size of the area in which the dumping occurred, and the intricacies of hydrogeology, this task depends on the resolution of numerous questions specific to each class member. Consequently, individual questions dominate such a determination. Finally, the resolution of various affirmative defenses—i.e., statute of limitations—also requires separate adjudication for each class member.

Viewed altogether, the individual questions that must be resolved in order to resolve plaintiffs' claims are staggering in both number and complexity. Indeed, "subsequent to the rendering of any class judgment which determined in plaintiffs' favor whatever questions were common to the class," the trial court in this case would have to conduct tens of thousands of complex individualized trials over causation, damages and affirmative defenses. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].) Invocation of the class action mechanism under these circumstances would not promote efficiency. Rather, it would "deprive either the defendant[s] or the members of the class—or both—of a fair trial." (See *City of San Jose, supra,* 12 Cal.3d at p. 462.)

The possible creation of subclasses makes no difference in this case. While subclasses may sufficiently minimize the individual issues in certain cases, we have long recognized that "there are limits outside of which the subclassification system ceases to perform a sufficiently useful function to justify the maintenance of the class action." (*City of San Jose, supra,* 12 Cal.3d at p. 463, fn. 10.) This is such a case. Plaintiffs allege that seven different defendants dumped over 12 chemicals at multiple locations on a 400-plus-acre property over 40-plus years. In doing so, these defendants allegedly harmed 50,000 to 100,000 people with different characteristics by placing them at greater risk for contracting over 40 possible medical conditions. "Given the number of variables involved in this case," the potential number of subclasses is mind-boggling. (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 813 [50 Cal.Rptr.2d 736].) Class certification under these facts would therefore defeat "the purposes served by class action litigation." (*Ibid.*)

In this respect, *O'Connor v. Boeing North American, Inc.* (C.D.Cal. 2000) 197 F.R.D. 404 (*O'Connor II*) is instructive. In *O'Connor v. Boeing North American, Inc.* (C.D.Cal. 1998) 184 F.R.D. 311, 316 (*O'Connor I*) and *O'Connor II,* the plaintiffs alleged that the defendants discharged radioactive and nonradioactive hazardous substances at four facilities. (See *O'Connor I,* at p. 316.) This discharge allegedly created a continuing health hazard for people living near these facilities. (*Id.* at pp. 316-317.) The plaintiffs sought

to certify three classes. As relevant here, class I consisted of " '[a]ll persons: (1) who presently reside or work in the Contamination Area or who, *at any time since 1946,* have resided or worked in the Contamination Area; and (2) who have not been diagnosed with a type of cancer or other serious illness or disease which may be attributed to exposure to the radioactive contaminants and/or hazardous, non-radioactive substances released from' " the facilities. (*Id.* at p. 317.) Like plaintiffs, the *O'Connor* plaintiffs sought to establish a medical monitoring program for the class funded by the defendants. (*Ibid.*)

Although the federal district court initially certified the medical monitoring class (see *O'Connor I, supra,* 184 F.R.D. at p. 339), it later decertified the class (see *O'Connor II, supra,* 197 F.R.D. at p. 413). In doing so, the court not only cited the "individualized focus of the statute of limitations defense" (*ibid.*), but also admitted that it had "underestimated the difficulty of applying the individualized factors required by" *Potter* "to the Class I medical monitoring claim in its" order certifying the class (*id.* at p. 413, fn. 6).

These conclusions are especially cogent in this case, given that plaintiffs' class claims and the class claims in *O'Connor II* are analogous in their breadth and complexity. Moreover, the reasoning of the court in *O'Connor II* is even more persuasive here because plaintiffs' proposed medical monitoring class is even broader than the class proposed in *O'Connor II.* (See *O'Connor I, supra,* 184 F.R.D. at p. 317 [the plaintiffs' class expressly excluded those persons who have been diagnosed with a medical condition attributable to exposure].) Indeed, other courts have refused to certify medical monitoring classes in analogous cases using similar reasoning. (See, e.g., *Goasdone v. American Cyanamid* (2002) 354 N.J.Super. 519 [808 A.2d 159, 172-173] (*Goasdone*) [refusing to certify a medical monitoring class consisting of all people who worked at a textile plant for 30 days or more from 1946 until 1983 and were exposed to benzidine-related dyes resulting in an increased risk of contracting bladder cancer because the individual issues predominated].)

The federal cases cited by plaintiffs in support of class certification are inapposite. Even assuming these cases are still persuasive (see *Goasdone, supra,* 808 A.2d at p. 169), all of them involved simpler facts and claims.[2] By contrast, plaintiffs' class claims are incredibly complex even for a mass

---

[2](See, e.g., *Friends for All Children v. Lockheed Aircraft* (D.C. Cir. 1984) 746 F.2d 816, 819-820 [46 A.L.R.4th 1113] [alleging that a single defendant negligently manufactured an aircraft that crashed, potentially causing a single neurological development disorder in no more than 149 children and seeking the creation of a medical monitoring fund for approximately 40 children]; *Day v. NLO* (S.D. Ohio 1994) 851 F.Supp. 869, 874-875 [alleging that a plant exposed visitors and workers to hazardous materials and seeking to certify a class of

tort action. Permitting certification under these facts would, as a practical matter, make *all* medical monitoring claims subject to class treatment. Such a result would open the "floodgates of litigation" notwithstanding our carefully crafted decision in *Potter*. (*Potter, supra,* 6 Cal.4th at p. 1009.) Rather than do so, I believe other procedures traditionally used to manage complex litigation, like consolidation and coordination, may be more appropriate. (See *Rose v. Medtronics, Inc.* (1980) 107 Cal.App.3d 150, 155 [166 Cal.Rptr. 16] ["consolidation of actions is the preferred procedure for disposition of" mass tort cases].)

Accordingly, I join the lead opinion in affirming the judgment of the Court of Appeal.

Baxter, J., and Chin, J., concurred.

**MORENO, J.,** Concurring and Dissenting.— ▮▮▮▮▮▮▮ I join parts I and II of the lead opinion, holding that there is no per se bar to class treatment of medical monitoring claims, and concluding that plaintiffs have demonstrated some common issues as a class. However, I dissent from the lead opinion's holding in parts III and IV that the trial court abused its discretion in finding that common issues predominate and in certifying the class in this case. Contrary to the majority, I conclude that the trial court did not abuse its discretion in certifying the class of plaintiffs seeking damages for the cost of future medical monitoring.

Plaintiffs in the present case allege that defendants caused contaminants, including toxic rocket fuel (ammonium perchlorate) and trichloroethylene (a carcinogenic solvent) to be leaked into the water table in Redlands and that this contaminated water was consumed by members of the proposed class. Plaintiffs brought a claim seeking damages for the cost of a court-supervised medical monitoring program, and punitive damages. The trial court determined that plaintiffs had a realistic chance of success on the merits. In addition, the trial court found that common issues predominate in this action and that plaintiffs could pursue their claims as a class.

The decision of a trial court to certify a class action is reviewed for abuse of discretion. "Because trial courts are ideally situated to evaluate the

---

"workers and frequenters" to the plant]; *Yslava v. Hughes Aircraft Co.* (D.Ariz. 1993) 845 F.Supp. 705, 707-708, 712 [alleging that a single defendant disposed of hazardous wastes in a single location over 29 years and identifying "24 separate subgroups representing precise geographic areas where plaintiffs lived, worked or went to school"]; *Boggs v. Divested Atomic Corp.* (S.D. Ohio 1991) 141 F.R.D. 58, 60-62 [alleging that a single plant released radioactive substances and seeking to certify a class numbering in the thousands of persons "who were residents, property owners or lessees of property within a radius of six miles from" the plant]; but see *Boggs v. Divested Atomic Corp.* (S.D. Ohio, Mar. 24, 1997, No. C-2-90-840) 1997 WL 33377790 [subsequently decertifying the class].)

efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).) The majority disregards this deferential standard of review and instead engages in its own examination of the record to decide that, while there are some common issues in this case, these issues do not predominate. The majority concludes, therefore, that the trial court erred in certifying the class. I believe that substantial evidence supports the trial court's certification order. Because I would uphold the trial court's decision to certify the class in this case, I dissent.

## I.

### A. *Applicable Standard of Review*

The lead opinion briefly summarizes the standard for reviewing a trial court's decision to certify a class. (See lead opn., *ante*, at p. 1106.) This short discussion, however, does not fully acknowledge the level of deference given to a trial court. The lead opinion cites our opinion in *Linder, supra*, 23 Cal.4th at page 436, for the proposition that "we must examine the trial court's reasons for [granting] class certification." The lead opinion does not mention, however, that in the following sentence in *Linder* we clarify that " 'Any valid pertinent reason stated will be sufficient to uphold the order.' " (*Ibid.*) Thus, while the lead opinion is correct in stating that reviewing courts may overturn a trial court ruling on certification if it is not supported by substantial evidence, it misses the point that *any* valid pertinent reason is sufficient to uphold an order for certification. This is an extremely deferential standard of review.

Further, we have stated that "a trial court ruling [on certification] supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation].' " (*Linder, supra*, 23 Cal.4th at pp. 435-436.) For example, in *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 927 [103 Cal.Rptr.2d 320, 15 P.3d 1071] (*Washington Mutual*), we reversed a Court of Appeal decision upholding the trial court's certification order because the order was "premised upon [a] faulty legal assumption." In the present case, however, the majority does not conclude that the trial court used improper criteria in granting the certification order, nor do they find that the trial court made erroneous legal assumptions. In such a case, "the sole question is whether the court abused its discretion." (*Occidental Land, Inc. v. Superior Court* (1976) 18 Cal.3d 355, 361 [134 Cal.Rptr. 388, 556 P.2d 750].)

In addition, an appellate court's review of a certification order should not consider the merits of the underlying suit. As we have said, "we view the question of certification as essentially a procedural one that does not ask whether an action is legally or factually meritorious." (*Linder, supra*, 23 Cal.4th at pp. 439-440.) In reviewing a certification order, then, we assume that the plaintiffs' theories of liability are viable. Any challenge to the viability of the plaintiffs' claims should be left for a pleading or motion that considers the merits of these claims. As we have stated, "[w]hen the substantive theories and claims of a proposed class suit are alleged to be without legal or factual merit, the interests of fairness and efficiency are furthered when the contention is resolved in the context of a formal pleading (demurrer) or motion (judgment on the pleadings, summary judgment, or summary adjudication) that affords proper notice and employs clear standards. Were we to condone merit-based challenges as part and parcel of the certification process, similar procedural protections would be necessary to ensure that an otherwise certifiable class is not unfairly denied the opportunity to proceed on legitimate claims." (*Id.* at pp. 440-441.)

### B.  *Trial Court's Certification Order*

In the certification order at issue here, the trial court explained that while it recognized that this case presents some individual issues, these issues were "manageable." The trial court found that plaintiffs' case derived from a common nucleus of facts and that common issues predominate. Because we review the certification order for abuse of discretion, I set forth in detail its relevant contents.

In granting the certification order, the trial court stated that its ruling was interlocutory: "This order may be rescinded or modified as the changed circumstances of the class, its representatives, or particular actions require." After concluding that plaintiffs have a realistic chance of success on the merits, and recognizing that plaintiffs allege that they were exposed as a class to water contaminated by toxic chemicals, the court noted: "This court further finds that although there is no evidence of the dosage of toxins that were received by the members of the proposed class, proof of dosage received is not necessary at this time." Additionally, the court found that "it is not necessary to determine the levels of toxins received by each plaintiff at this time."

Most importantly, the trial court found that "[t]he issues of law and fact in this case all evolve from a common nucleus of facts and these common questions of law and fact predominate over those that are individual to the plaintiffs. [¶] The court recognizes that there are individual issues that will

have to be dealt with at the time of trial, however, the court finds these individual issues to be manageable."

Turning to the benefits of class treatment, the trial court found that "proceeding with this action as a class action will substantially benefit the court and the litigants because it will provide a superior method of dealing with the common questions of law and fact that exist in this case." The trial court noted that it had "considered other methods of proceeding with this litigation" but found that "the class action is the superior method."

In addition, the trial court found that the prerequisites for a class action set forth in Federal Rules of Civil Procedure, rule 23(a) (28 U.S.C.), were satisfied. We have stated that in determining whether a class action proponent has demonstrated a predominance of common issues and manageability of the class, "we may look to the procedures governing federal class actions under rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.) . . . for guidance." (*Washington Mutual, supra*, 24 Cal.4th at p. 922.) The trial court in this case found that "(1) The class consists of an estimated 50,000 - 100,000 people and therefore, the members of the class are so numerous that joinder of members of the class as individual plaintiffs is impracticable; (2) The common questions of law and fact predominate over those that are individual to the plaintiffs; (3) The claims of the persons representing the class are typical of the class generally; (4) The persons acting as class representatives are able to fairly and adequately protect the interest of all members of the class and class counsel is able to adequately represent the class."

## II.

Applying the standard of review to the trial court's certification order, it is clear that the trial court did not abuse its discretion in certifying the class in this case. Contrary to the majority, I conclude that substantial evidence supports the trial court's determination that common issues predominate and that any individual issues in this case are manageable.

### A. *Duty and Breach*

In reviewing the factors that plaintiffs will have to prove at trial to recover medical monitoring damages, there is substantial evidence to support the trial court's conclusion that common issues predominate. Part II of the lead opinion recognizes that it is undisputed that several key issues at trial will be proven by evidence that is common to all class members. (Lead opn., *ante*, at pp. 1106-1108.) As the lead opinion states, because plaintiffs' claims sound

generally in negligence, plaintiffs will have to prove duty, breach of duty, proximate cause, and damages. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) The lead opinion acknowledges that the issue of whether defendants owed a duty of care to the proposed class members is susceptible to common proof. (Lead opn., *ante*, at pp. 1106-1107.) In addition, the lead opinion states that the issue of defendants' breach of this duty of care is also one that will be proven by evidence common to all class members. (*Ibid.*)

The trial court, in its certification order, explained that it found that common issues predominate because "[t]he issues of law and fact in this case all evolve from a common nucleus of facts." This conclusion is supported by substantial evidence since the central question of whether defendants acted negligently is common to all class members. In order to establish defendants' liability, plaintiffs will present common evidence attempting to show that defendants negligently disposed of toxic chemicals that contaminated the groundwater of Redlands. Evidence of how these chemicals were discharged, and in what amounts, and how they entered into the domestic water system, will be common to all class members. In fact, all of defendants' actions will be proven by common evidence.

### B. *Proximate Cause and Damages: The Potter Factors*

In addition to establishing defendants' duty of care and their breach of this duty, plaintiffs will also have to show that their injuries were proximately caused by defendants' actions and that they are entitled to damages as compensation for these injuries. Plaintiffs in this case, however, do not seek traditional compensatory damages. Instead, they seek to recover damages for the cost of medical monitoring of future injuries. As we explained in *Potter*, "[i]n the context of a toxic exposure action, a claim for medical monitoring seeks to recover the cost of future periodic medical examinations intended to facilitate early detection and treatment of disease caused by a plaintiff's exposure to toxic substances." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1004-1005 [25 Cal.Rptr.2d 550, 863 P.2d 795] (*Potter*).)

Damages for medical monitoring are unlike a traditional damages remedy because in order to recover medical monitoring damages, a plaintiff need not demonstrate a present physical injury or even show proof that injury is reasonably certain to occur in the future. We have determined that "medical monitoring may be called for as a result of defendant's tortious conduct, even in the absence of actual physical injury." (*Potter, supra,* 6 Cal.4th 965, 1007.) "[R]ecovery of medical monitoring damages should not be dependent upon a showing that a particular cancer or disease is reasonably certain to

occur in the future." (*Id.* at p. 1008.) To recover medical monitoring damages, a plaintiff must show that "the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable." (*Id.* at p. 1009.)

As the lead opinion explains, we set forth five factors in our decision in *Potter* (the *Potter* factors) that are relevant to a court's determination of the reasonableness and necessity of medical monitoring. (*Potter, supra,* 6 Cal.4th at p. 1009; see lead opn., *ante,* at p. 1103.) The five *Potter* factors are not novel evidentiary burdens; they are simply meant to give courts guidance in determining whether plaintiffs seeking medical monitoring have met the traditional tort requirements of causation and damage. (See lead opn., *ante,* at p. 1105.) Thus, plaintiffs will need to present evidence relating to the *Potter* factors in order to prove the elements of proximate causation and damages.

As with the elements of duty and breach, I agree with the majority that some of the *Potter* factors are clearly subject to common proof. The majority recognizes that two of the five *Potter* factors—the toxicity of the chemicals allegedly discharged and the seriousness of a disease for which the plaintiffs are at risk—will involve common proof.

Furthermore, the lead opinion acknowledges that "[s]trictly speaking," the trial court was correct in ruling that the first *Potter* factor—the significance and extent of plaintiffs' exposure to chemicals—is subject to common proof, since under plaintiffs' theory of liability, the exact dosage of each discharged chemical received by each individual plaintiff is irrelevant. (Lead opn., *ante,* at p. 1108.) Part III of the lead opinion, however, ultimately rejects plaintiffs' theory of liability and concludes that the first *Potter* factor is not subject to common proof. It is largely this determination, that the issue of plaintiffs' exposure is not subject to common proof, that leads the majority to reject the trial court's conclusion that common issues predominate. For this reason, I will focus on this factor to explain why I believe that the issue of exposure is subject to common proof, and that the trial court did not err in concluding that common issues predominate.

The lead opinion refers to *Potter* for the proposition that "evidence of exposure alone cannot support a finding that medical monitoring is a reasonably necessary response." (Lead opn., *ante,* at pp. 1108-1109, citing *Potter, supra,* 6 Cal.4th at p. 1009.) This statement is, of course, correct. A plaintiff cannot recover the cost of medical monitoring merely because he or she has been exposed to toxic chemicals. Instead, a plaintiff must show the need for medical monitoring in light of the other *Potter* factors, including the

toxicity of these chemicals and the seriousness of the diseases for which plaintiff is at risk as a result of the exposure to these chemicals.

The lead opinion is incorrect, however, in concluding from our statements in *Potter* that the issue of plaintiffs' exposure to toxic chemicals cannot be subject to common proof. We did not decide in *Potter* whether evidence of exposure could be presented on a class-wide basis. We merely said that one factor relevant in determining whether a plaintiff could recover the cost of medical monitoring was the significance and extent of plaintiff's exposure to the toxic chemicals. We did not say whether or not plaintiffs could present evidence of exposure on a class-wide basis by alleging that all plaintiffs in a proposed class have received a certain minimum level of exposure to the chemicals.

Plaintiffs' theory of liability is that *all* individuals who meet the class requirements are entitled to medical monitoring. Plaintiffs allege that everyone exposed to defendants' discharged chemicals over specified minimum safety levels "for some part of a day, for greater than 50% of a year, for one or more years from 1955 to the present" will require specialized monitoring for diseases caused by such exposure. Class membership, therefore, is restricted by definition to persons who have received a specified, medically significant minimum level of exposure to the allegedly contaminated water. Plaintiffs claim that individual class members need only establish their residency and/or employment in the contaminated area for at least six months to be eligible for medical monitoring. Thus, under plaintiffs' theory of liability, the significance and extent of toxic exposure is susceptible to common proof. While plaintiffs may or may not be able to succeed in proving this theory, the trial court was correct in accepting this theory for purposes of a certification motion.

The majority concludes, however, that plaintiffs cannot prove exposure on a class-wide basis because each plaintiff received different dosages of toxic chemicals. (See lead opn., *ante*, at p. 1109.) Of course, whether someone is exposed to toxic chemicals is not the same issue as what dosage of the chemical he or she received. I agree with the majority that any relevant questions relating to variations in actual chemical dosage received by individual members of the plaintiff class are likely not susceptible to common proof. Plaintiffs, however, have constructed their theory of liability to make these questions of individual dosage largely irrelevant.

The majority errs in examining the record in this case to determine whether plaintiffs' experts' declarations support plaintiffs' theory of liability. The lead opinion finds that "the medical expert testimony plaintiffs

presented in support of their motion for class certification is too qualified, tentative and conclusionary to constitute substantial evidence that plaintiffs, by adopting a liability theory that makes actual dosages and variations in individual response irrelevant, will be able to prove causation and damages by common evidence." (Lead opn., *ante*, at p. 1111.) This type of reevaluation of the record and critique of expert testimony is inappropriate in the context of a certification motion.

In reviewing a certification order, we are not called upon to determine whether plaintiffs' experts' declarations demonstrate the reasonableness and necessity of medical monitoring.[1] Whether the evidence submitted in support of certification is adequate to support plaintiffs' theories on their merits is not before us, since certification may not be "conditioned upon a showing that class claims for relief are likely to prevail." (*Linder, supra*, 23 Cal.4th at p. 443.)

By rejecting the viability of plaintiffs' theory of liability—that all plaintiffs in the proposed class are entitled to medical monitoring based on a threshold level of exposure—the majority is effectively ruling on the substantive merits of plaintiffs' claims in the context of a procedural motion for certification. Such a conclusion should not be made in the context of a certification motion but rather should be made in the context of a formal pleading or motion that affords proper notice to the parties and follows clear standards of review. By ruling on the merits of plaintiffs' claims in the context of a certification motion, the majority denies plaintiffs the procedural protections to which they are entitled. (*Linder, supra,* 23 Cal.4th at p. 440.)

In addition, the majority's search of the record for evidence to support plaintiffs' theory of liability risks making a motion for certification a more complicated and burdensome procedure. As we have cautioned, "[s]ubstantial discovery . . . may be required if plaintiffs are expected to make meaningful presentations on the merits. All of that is likely to render the certification process more protracted and cumbersome, even if . . . trial courts were prohibited from resolving factual disputes. Such complications hardly seem necessary when procedures already exist for early merit challenges." (*Linder, supra,* 23 Cal.4th at p. 441, fn. omitted.)

---

[1] I note, however, that the record does contain evidence to support plaintiffs' theory of liability. Plaintiffs' expert, Dr. Teitlebaum, opined that "even small doses of environmental carcinogens . . . such as those present in Redlands, [and] their breakdown products delivered to the population, are quite capable of interacting with the human genome to produce malignant outcomes." Dr. Teitlebaum further stated that "any person who fulfills the class definition proposed in this case is at greater risk of developing cancer and other serious illness which is known by scientists and toxicologists to be associated with the chemicals at issue in this case."

Furthermore, the majority ignores the fact that the nature of the remedy requested in this case reduces the importance of each plaintiff's individual exposure. If plaintiffs had sought to recover compensatory damages, the issue of each individual's exposure clearly would have been relevant to each individual's recovery. In seeking medical monitoring damages, however, plaintiffs need not prove present or future individual injury. Instead, they need only show that medical monitoring is reasonably necessary as a result of exposure to the toxic chemicals. Plaintiffs allege that all class members, having received a threshold level of exposure, are entitled to the same remedy because they are all at a greater risk of disease. This is the approach taken in *Yslava v. Hughes Aircraft Co.* (D.Ariz. 1993) 845 F.Supp. 705, where the court determined that for a class action seeking medical monitoring, "[a]ll persons who were exposed to [a certain] level for at least a year would qualify for medical monitoring. Thus, *proof of an exact or individual amount of exposure or particular risk level is not necessary*. The core issues of liability and exposure are common to all class members." (*Id.* at p. 713, italics added.)

Ultimately, the majority, in rejecting plaintiffs' theory of liability, fails to give proper deference to the findings of the trial court. The trial court accepted plaintiffs' theory of liability for purposes of the certification order. As the trial court concluded, "although there is no evidence of the dosage of toxins that were received by the members of the proposed class, proof of the dosage received is not necessary at this time." Moreover, the certification order was interlocutory. Thus, should plaintiffs' theory of liability prove to be not viable at a later date, the trial court retained the option of decertifying the class. (See *O'Connor v. Boeing North American, Inc.* (C.D.Cal. 2000) 197 F.R.D. 404, 408-409 [while trial court initially certified class seeking damages for medical monitoring, the court decertified the class after its summary judgment rulings].) At this early point in the proceedings, however, the trial court assumed, as it should, that plaintiffs' theory of liability was viable. Under this theory, the first *Potter* factor—plaintiffs' exposure to the toxic chemicals—is subject to common proof.

Turning to the remaining *Potter* factors, the lead opinion briefly states that proof of each individual plaintiff's chances of developing a particular disease, had he or she not been exposed, may not be subject to common proof. I agree with the lead opinion that an individual's preexisting conditions are, by definition, not susceptible to common proof. I am not convinced, however, that predisposition to a disease should preclude a plaintiff who has been exposed to toxic chemicals from receiving medical monitoring for diagnostic purposes. As we stated in *Potter*, "While there is no question that a defendant ought not to be liable for medical monitoring of a plaintiff's

preexisting condition that is unaffected by a subsequent toxic exposure negligently caused by the defendant, we see no reason why the defendant should not be held responsible for any increased or different monitoring of the preexisting condition (whether or not the preexisting condition is caused by the plaintiff's voluntary conduct) where necessitated as a direct result of the subsequent exposure." (*Potter, supra,* 6 Cal.4th at p. 1009, fn. 27.) Thus, neither the possibility nor the actuality of preexisting medical conditions constitutes a bar to medical monitoring liability. Furthermore, screening for preexisting conditions, while individualized, is irrelevant to an initial determination of defendants' liability. Such screening for preexisting conditions can be done postjudgment, perhaps as an initial part of the monitoring process.

Finally, the lead opinion does not discuss the fifth *Potter* factor, the clinical value of early detection and diagnosis. (*Potter, supra,* 6 Cal.4th at p. 1009.) Presuming that the clinical value of early detection and diagnosis varies among diseases, whether monitoring has clinical value in a particular case would seem to depend, at least in part, on the specific toxicity of the chemicals allegedly discharged. As previously discussed, the lead opinion agrees that such toxicity may be susceptible to common proof.

Part I of the lead opinion states that even if one *Potter* factor is not subject to common proof, this should not prove fatal to a certification motion. The lead opinion explicitly rejects defendants' argument that *Potter* requires that *each* of the five factors is capable of common proof. (See lead opn., *ante,* at p. 1105.) I agree with this conclusion and determine that even though some factors may not involve common proof, certification of a class action may still be appropriate. As we have stated, "the fact that each member of the class must prove his [or her] separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper" and "[t]he requirement of a community of interest does not depend upon an identical recovery." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513] (*Vasquez*).) Even "that each class member might be required ultimately to justify an individual claim does not necessarily preclude the maintenance of a class action." (*Collins v. Rocha* (1972) 7 Cal.3d 232, 238 [102 Cal.Rptr. 1, 497 P.2d 225]; see also *Vasquez, supra,* at p. 815.)

Here, the trial court concluded that class treatment was the superior method since the case arose out of a common nucleus of facts and common issues predominate. In my view, substantial evidence supports this conclusion. I agree with the majority that the issues of defendants' duty and breach of this duty is susceptible to common proof. In addition, I conclude that

most, if not all, of the *Potter* factors will involve proof that is common to all class members. Therefore, unlike the majority, I cannot conclude that the trial court abused its discretion in determining that common issues predominate.

### III.

While the majority concludes that there is no per se bar to class treatment of medical monitoring claims, I am concerned that by reversing the trial court's decision to certify the class in this case, the effect of our ruling will be a de facto bar on class treatment of medical monitoring claims. Plaintiffs' theory of liability is that all plaintiffs who meet a threshold level of exposure should recover damages for the cost of medical monitoring. The majority rejects this theory, agreeing with defendants that proof of exposure alone is insufficient to show causation and damages. Since the majority believes that each plaintiff will have to show the specific dosage of toxic chemicals he or she received, they conclude that the trial court erred in certifying this case as a class action. My concern with this holding is that it essentially precludes plaintiffs from constructing a claim for medical monitoring damages that minimizes questions of individual exposure. If plaintiffs are required to show evidence of dosage on an individual basis, and such a requirement of individualized proof will prove fatal to a certification motion, then essentially no claim for medical monitoring damages can be treated on a class-wide basis.

In every potential class action for medical monitoring damages, exposure will be individualized in some sense. A group of plaintiffs seeking medical monitoring based on their exposure to asbestos in the workplace, for example, will have been employed for varying amounts of time. Even for those plaintiffs employed for the same length of time, contact with hazardous substances may vary from plaintiff to plaintiff. Under the majority's holding, these employees could not bring a class action for medical monitoring damages because each class member did not receive an identical exposure to the asbestos. Even if the employees attempted to bring an action for medical monitoring damages based on a minimum level of exposure, the majority would require each plaintiff to prove his or her individual level of exposure, and would conclude that, as a result, common issues do not predominate and the class could not be certified. Ultimately, by rejecting plaintiffs' theory of liability in the present case and concluding that common issues do not predominate, the majority risks barring class treatment for any medical monitoring claim. (Cf. *Lamb v. United Security Life Company* (S.D. Iowa 1972) 59 F.R.D. 25, 33 [to reject class actions for securities fraud merely because of the existence of the individual reliance issue would "wholly eviscerate Rule 10b-5"].)

## IV.

Contrary to the majority, I believe that this case is ideally suited for class treatment. The majority's failure to uphold the trial court's decision to certify the class in this case is contrary to the public policy of this state. As we have said, "this state has a public policy which encourages the use of the class action device." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 473 [174 Cal.Rptr. 515, 629 P.2d 23].) Class actions " 'serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation.' " (*Id.* at p. 469.)

By allowing plaintiffs to pursue their claims as a class, the trial court's certification order may advance a number of public policies. In *Potter*, we found that "recovery of medical monitoring costs is supported by a number of sound public policy considerations." (*Potter, supra,* 6 Cal.4th at p. 1008.) We listed four public policy reasons supporting medical monitoring damages: (1) the "important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease, particularly in light of the value of early diagnosis and treatment for many cancer patients"; (2) the "deterrence value in recognizing medical surveillance claims" because allowing plaintiffs to recover the cost of care could deter the irresponsible discharge of toxic chemicals; (3) the mitigation of future illness and therefore the reduction of overall costs that could result from providing medical monitoring before the consequences of exposure are manifest; (4) the fact that "it would be inequitable for an individual wrongfully exposed to dangerous toxins, but unable to prove that cancer or disease is likely, to have to pay the expense of medical monitoring when such intervention is clearly reasonable and necessary." (*Ibid.*)

I agree with the trial court that plaintiffs' claims for medical monitoring damages are most effectively and efficiently presented as a class action. Plaintiffs allege that they were injured by defendants as a class. As claimed by plaintiffs, defendants negligently disposed of toxic rocket fuel, which seeped into the groundwater of Redlands and contaminated the city's drinking water. The majority holds that notwithstanding this class-wide injury, plaintiffs cannot recover as a class. Instead, they must pursue their claims on an individual basis. In order to recover the cost of medical monitoring for risks of diseases allegedly caused by defendants' negligent actions, each

plaintiff will have to prove the elements of a damages claim. Each plaintiff will have to show that defendants had a duty of care, that defendants breached this duty by negligently disposing of toxic chemicals, and that the chemicals contaminated the groundwater. He or she will additionally have to show the amount of contaminants that entered the groundwater, and when, where, and at what levels the contaminants were pumped by the city's wells and introduced into the domestic water system. Each plaintiff will have to prove the toxicity of the chemicals, and the diseases he or she is at risk of contracting as a result of exposure to the chemicals. Each plaintiff will have to show that medical monitoring of future potential diseases is a reasonably necessary response based on the risk of disease due to exposure to the chemicals.

Absent class treatment, therefore, each individual plaintiff will present the same or essentially the same arguments and evidence (including expert testimony) on these numerous complicated issues. Any Redlands resident who wishes to recover the cost of medical monitoring will have to go to great expense to prove defendants' liability and his or her right to recover. The result will be a multiplicity of trials conducted at enormous cost to both the judicial system and the litigants. As Chief Judge Weinstein observed in *In re "Agent Orange" Product Liability Litigation* (E.D.N.Y. 1983) 100 F.R.D. 718, 720, "[i]f [mass injury] claims are dealt with individually, the result might [be] '. . . a tedium of repetition lasting well into the next century.'" "It would be neither efficient nor fair to anyone, including defendants, to force multiple trials to hear the same evidence and decide the same issues." (*Boggs v. Divested Atomic Corp.* (S.D. Ohio 1991) 141 F.R.D. 58, 67 (*Boggs*).)[2] Class treatment here therefore promotes judicial efficiency and economy.

More importantly, it is unlikely that, on an individual basis, plaintiffs will pursue such a remedy. Class claims for medical monitoring damages typically present a large body of plaintiffs who, individually, do not expect a large recovery, but, as a class, expect a significant recovery. "Where it is not economically feasible to obtain relief [in separate suits] . . . , aggrieved persons may be without any effective redress unless they may employ the class-action device." (*Deposit Guaranty Nat. Bank v. Roper* (1980) 445 U.S.

---

[2]*Boggs, supra,* 141 F.R.D. 58, involved claims by neighbors of an industrial facility that hazardous materials released from the facility had contaminated their properties. In certifying a medical monitoring class, the federal district court "rejected defendants' view of the individualized nature of the plaintiffs' claims" (*id.* at p. 67), which parallels defendants' arguments here (see *id.* at pp. 64-65). The court noted that "[c]ommon issues of liability, causation, and remedies not only predominate but overwhelm individualized issues. If these claims were tried separately, the amount of repetition would be manifestly unjustified." (*Id.* at p. 67.)

326, 339 [100 S.Ct. 1166, 1174, 63 L.Ed.2d 427].) As we have stated, "[w]hile the mere denial of certification does not, as a legal matter, terminate the right of any plaintiff to pursue claims on an individual basis, it is likely to have that net effect when there has been injury of insufficient size to warrant individual action." (*Linder, supra,* 23 Cal.4th at p. 441.) In the present case, the cost of litigating defendants' liability undoubtedly will be greater than any expected individual recovery in the form of damages for the cost of medical monitoring. For "exposure only" plaintiffs individually to pursue even plainly meritorious medical monitoring claims may be economically infeasible.

Furthermore, class treatment of plaintiffs' claims would secure uniform results for any viable medical monitoring claims pled herein. To the extent a class action " ' "eliminates the possibility of repetitious litigation" ' " of common issues (*Linder, supra,* 23 Cal.4th at p. 435), it also eliminates the possibility of inconsistency in their adjudication.

Not only is the nature of plaintiffs' claims well suited for class treatment, but also the remedy requested here is one that is most effectively administered to a class of plaintiffs. If plaintiffs receive the medical monitoring remedy as a class, one unitary monitoring program with clear standards and procedures can be established. An initial screening can be utilized to detect any preexisting conditions, and to identify any specific risk factors. Diseases may be easier to identify through class treatment of medical monitoring plaintiffs as well, because doctors monitoring a class of plaintiffs exposed to the same toxic chemicals may see similar symptoms in a number of individuals.

In addition, the maintenance of a class action for medical monitoring damages serves as a deterrent for corporate polluters. "Absent a class suit, a wrongdoing defendant [may] retain the benefit of its wrongs." (*Vasquez, supra,* 4 Cal.3d at p. 810.) " 'Allowing plaintiffs to recover the cost [of medical monitoring] deters irresponsible discharge of toxic chemicals by defendants.' " (*Metro-North Commuter R. Co. v. Buckley* (1997) 521 U.S. 424, 451 [117 S.Ct. 2113, 2127, 138 L.Ed.2d 560] (conc. & dis. opn. of Ginsburg, J.).) Since the cost of litigating cases on an individual basis may be prohibitive, a class action may be the only way to establish defendants' liability for the cost of medical monitoring. In fact, unless defendants are held liable for the cost of medical monitoring, they may escape liability altogether. As one court has noted, "The difficulty of proving causation, where the disease is manifested years after exposure, has caused many commentators to suggest that tort law has no capacity to deter polluters, because the costs of proper disposal are often viewed by polluters as

exceeding the risk of tort liability. [Citations.] However, permitting recovery for reasonable pre-symptom, medical-surveillance expenses subjects polluters to significant liability when proof of the causal connection between the tortious conduct and the plaintiffs' exposure to chemicals is likely to be most readily available." (*Ayers v. Jackson Tp.* (1987) 106 N.J. 557, 604 [525 A.2d 287, 311-312, 76 A.L.R.4th 571].)

Thus, while " '[a]ny valid pertinent reason stated [would] be sufficient to uphold the [certification] order' " (*Linder, supra*, 23 Cal.4th at p. 436), the trial court's certification order in this case is supportable on several grounds: responsible public health policy, efficiency in the expenditure of judicial resources, uniformity of adjudication, effective administration of the remedy, and deterrence of wrongdoing by potential polluters.

## V.

Part I of the lead opinion states that medical monitoring claims may be treated as a class "so long as any individual issues the claims present are manageable." (Lead opn., *ante*, at pp. 1105-1106.) In reviewing the evidence to be proven at trial, it is clear that the trial court was well within its discretion in concluding that any individual issues in this case are manageable. The majority errs in reweighing the balance of common versus individual issues in this case and determining that common issues do not predominate. This is a conclusion we need not reach. Instead, the weighing of individual versus common factors and the decision on the manageability of the class is an exercise left to the sound discretion of the trial court. A trial court's class certification determination is discretionary because " 'it is "a practical problem, and primarily a factual one with which a [trial] court generally has a greater familiarity and expertise than does a court of appeal[]." ' " (*Boughton v. Cotter Corp.* (10th Cir. 1995) 65 F.3d 823, 828.)

The majority essentially disregards the trial court's conclusion that the individual issues in this case are manageable and that common issues predominate. Rather than reviewing the certification order for abuse of discretion, the majority rejects plaintiffs' theory of liability after a merit-based analysis of plaintiffs' claims. Our role as a reviewing court, however, is not to determine whether or not we agree with the trial court's conclusion that common issues predominate but only to see whether this conclusion was an abuse of discretion. Unless this decision was an abuse of discretion, it should be upheld.

Plaintiffs allege that they were injured as a class by defendants. They ask that defendants be held responsible for the cost of medical monitoring,

which can detect, and prevent, future illness. The trial court determined that class treatment of plaintiffs' claims was the superior method of dealing with the common questions of law and fact that exist in this case. Substantial evidence supports this determination, and so I conclude that the trial court did not abuse its discretion in certifying the class in this case. Therefore, I dissent.

George, C. J., concurred.