**J.B.D.L. CORP., d/b/a Beckett Apothecary, et al., Plaintiffs,**

v.

**WYETH–AYERST LABORATORIES, INC., et al., Defendants.**

No.  C–1–01–704.

United States District Court, S.D. Ohio, Western Division.

May 12, 2003.

210

Eric L. Cramer, H. Laddie Montague, Ruthanne Gordon, David F. Sorensen, Berger & Montague PC, Eugene A. Spector, Jay S. Cohen, Spector Roseman & Kodroff PC, Philadelphia, PA, John Charles Murdock, Theresa Lee Groh, Murdock Goldenberg Schneider & Groh, Wilbert Benjamin Markovits, Markovits & Greiwe, Cincinnati, OH, Krishna Narine, Schiffrin & Barroway LLP, Bala Cynwyd, PA, Gordon A. Einhorn, Steve D. Shadowen, Hangley Aronchick Segal & Pudlin, Harrisburg, PA, for Plaintiffs.

Grant Spencer Cowan, James Ralph Adams, Frost Brown Todd LLC, Cincinnati, OH, Mark R. Merley, Asim Varma, David S. Eggert, Douglas L. Wald, Matthew D. Meisner, Son B. Nguyen, William J. Baer, Mark R. Merley, Arnold & Porter, Washington, DC, Brian D. Werner, Brooke B. Ward, Peggy M. Balesteri, Winston & Strawn, Chicago, IL, for Defendants.

## ORDER

BECKWITH, District Judge.

This matter is before the Court on Plaintiff J.B.D.L. Corporation's Motion for Class Certification (Doc. No. 28). For the reasons set forth below, Plaintiff's motion for class certification is well-taken and is **GRANTED**. Defendant Wyeth–Ayerst Laboratories, Inc.'s motion to file a supplemental brief (Doc. No. 45) is not well-taken and is **DENIED**.

### I. *Background*

In this case, Plaintiff J.B.D.L. Corporation ("J.B.D.L.") brings antitrust claims against Defendant Wyeth–Ayerst Laboratories, Inc. ("Wyeth") and its parent company, American Home Products Corporation, under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, relating to sales of

its hormone replacement therapy drug, Premarin.

Premarin is a conjugated estrogen indicated for use to alleviate vasomotor symptoms associated with female menopause. Premarin has also been approved for use to combat osteopororis. The name Premarin is derived from its primary ingredient, pregnant mare's urine. According to the complaint, Wyeth has been manufacturing and selling Premarin since 1943 and possesses 97% of the national market share of conjugated estrogen prescription drugs. Complaint ¶¶ 14, 27.

The complaint states that there was no direct competitor of Premarin until March 1999, when Duramed Pharmaceuticals, Inc. received FDA approval to market Cenestin. Cenestin is a plant-based conjugated estrogen which also alleviates vasomotor symptoms. Complaint ¶¶ 29, 30. The complaint further states that although Cenestin has been priced 14–26% less than Premarin, Premarin has maintained a 97% share of the conjugated estrogen market. Id. ¶ 32.

The complaint alleges that Wyeth has been able to maintain this extraordinary share through the anticompetitive method of wielding market power over pharmacy benefits managers ("PBM's"), managed care organizations ("MCO's"), employers, and other providers of health care plans, to enter into contracts which prohibit or severely restrict these entities from offering Cenestin to covered members. Complaint ¶ 34. PBM's establish lists of drugs, or formularies, which will be offered to persons covered by a health plan and then enter into contracts with drug manufacturers to offer their drugs to covered members at substantially reduced prices. Id. The complaint contends that Wyeth has entered into exclusive dealing contracts with PBM's which offer rebates, discounts, and other incentives if Premarin is the only conjugated estrogen listed on the formulary. Id. ¶ 42. The effect of these contracts, says the complaint, has been to artificially restrict access to the lower-priced Cenestin and to artificially maintain Premarin above the competitive price. Id. ¶¶ 41, 49, 51.

Plaintiff J.B.D.L. Corporation ("J.B.D.L.") is a retail pharmacy located in Sharon Hill, Pennsylvania. Complaint ¶ 8.[1] J.B.D.L. purchases Premarin directly from Wyeth. Id. As a "direct purchaser" of Premarin, J.B.D.L. is not able to participate in the rebate and discount programs offered by Wyeth. Id. ¶ 43. Thus, the complaint alleges, J.B.D.L. has been forced to purchase its conjugated estrogen at prices higher than it would have had to pay in a competitive market. Id. ¶¶ 43, 45, 49.

On October 12, 2001, J.B.D.L. filed a complaint against Wyeth which alleges that the conduct described above violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.[2] In addition, the complaint contains class action allegations on behalf of a potential class consisting of:

All persons or entities who purchased Premarin in the United States directly from any defendant at any time during the period March 24, 1999 through the present. (The class excludes defendant, defendants' parents, subsidiaries and affiliates and en-

---

1. The case management order in this case (Doc. No. 20) consolidated this case with *McHugh Pharmacy Wynnewood, Inc. v. Wyeth–Ayerst Laboratories, Inc.*, C–1–01–745 (S.D.Ohio) and made the *J.B.D.L.* complaint the operative complaint for the consolidated actions. *See* Doc. No. 20, ¶ 26. For simplicity's sake, for the most part the Court will only refer to J.B.D.L. as the named plaintiff in this case.

2. Section 1 of the Sherman Act provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
15 U.S.C. § 1. Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2. Parties may bring civil actions for money damages for violations of Sections 1 and 2 of the Sherman Act pursuant to the Clayton Act, 15 U.S.C. §§ 15(a) & 26. *Hodges v. WSM, Inc.*, 26 F.3d 36, 37 (6th Cir.1994).

tities, if such exist, which entered into contracts with any defendant which provided or were designed to insure that Premarin would be the sole and exclusive conjugated estrogen product made available to its customers.)

Complaint ¶ 18.

On March 6, 2002, J.B.D.L. filed a motion (Doc. No. 28) to certify a class consisting of:

All persons and entities who purchased (or purchase) Premarin in the United States directly from Wyeth at any time during the period from March 24, 1999 until the present.

Doc. No. 28, at 2. In its motion, J.B.D.L. argues that the class meets the requisites for certification under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Briefing was completed on Plaintiff's motion on September 11, 2002, although the parties have since filed supplemental briefs and authorities. In its brief in response, Wyeth opposes class certification on a number of grounds, including: 1) individual issues will predominate over classwide issues; 2) Plaintiffs will be unable to show class wide impact of the alleged anti-competitive conduct; 3) a class action is not a superior method to resolve the issues presented; 4) this case fails to satisfy the adequacy of representation and typicality requirements of Rule 23(a); and 5) J.B.D.L. does not present a workable definition for the proposed class.

## II. Analysis

### A. Rule 23(a)

■ Rule 23(a) sets forth four requirements for the certification of a class. The proposed class representative must establish that each of the four requirements is satisfied with respect to the proposed class. *See In re American Medical Systems, Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996); *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Kutschbach v. Davies,* 885 F.Supp. 1079, 1083 (S.D.Ohio 1995). Within the framework of Rule 23, the Court has broad discretion to determine whether an action is maintainable as a class action. *See Kentucky Educators Public Affairs Council*

*v. Kentucky Registry of Election Finance,* 677 F.2d 1125, 1135 (6th Cir.1982). The four requirements are as follows:

(1) the members of the class must be so numerous that joinder of all members is impracticable (the "numerosity requirement");

(2) questions of law or fact must be common to the entire class (the "commonality requirement");

(3) the claims or defenses of the named representative must be typical of the claims or defenses of the class (the "typicality requirement"); and

(4) the named representative must fairly and adequately represent the interests of the class as a whole (the "adequacy of representation" requirement).

Fed.R.Civ.P. 23(a).

■ In determining whether to certify a class, the Court must not consider the merits of the action. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). For purposes of a class certification motion, the Court must accept as true the allegations of the complaint. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978); *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The Court "may consider reasonable inferences drawn from facts before [it] at that stage of the proceedings." *Senter,* 532 F.2d at 523.

If the proposed class representative establishes that each of the requirements of Rule 23(a) is satisfied, he must also demonstrate that the class is an appropriate one for certification under one of the three subsections of Rule 23(b). *See Kutschbach,* 885 F.Supp. at 1083–84. J.B.D.L. urges the Court to certify the proposed class pursuant to Rule 23(b)(3), which requires, in addition to the four requirements of Rule 23(a), a showing that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed.R.Civ.P. 23(b)(3).

### 1. The Numerosity Requirement

■ To satisfy Rule 23(a)(1), Plaintiff must establish that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The numerosity requirement does not impose an absolute numerical limitation. *See General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *Kutschbach,* 885 F.Supp. at 1084. Rather, the Court must examine the facts of the case and determine whether Plaintiff will suffer distinct litigational hardship or inconvenience if joinder is required. *See Kutschbach,* 885 F.Supp. at 1084. "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996).

■ According to the complaint, the number of potential class members is unknown, but is believed to be "in the many hundreds or more" and "geographically dispersed throughout the United States." Complaint ¶ 19. J.B.D.L.'s brief indicates that, based on analysis of Wyeth's sales records produced in discovery, the number of potential class members is more likely to be in the thousands. Doc. No. 28, at 12–13. Although Wyeth does not challenge numerosity, the Court notes that, given that the direct purchasers are likely in the thousands and that they are geographically dispersed, it appears beyond question that this case meets the numerosity requirement. *See Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 624 (5th Cir.1999) ("Although the number of members in a proposed class is not determinative of whether joinder is impracticable ... the size of the class in this case—100 to 150 members—is within the range that generally satisfies the numerosity requirement.") (internal citation omitted); *Eisenberg v. Gagnon,* 766 F.2d 770, 785–86 (3rd Cir. 1985)("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed.R.Civ.P. 23(a)(1).").

Accordingly, the Court finds that this case satisfies the numerosity requirement of Rule 23(a)(1).

### 2. The Commonality Requirement

■ To satisfy Rule 23(a)(2), Plaintiff must establish that "there are questions of law or fact common to the class." Fed. R.Civ.P. 23(a)(2). J.B.D.L. identifies the following as common issues of law and fact: 1) whether Wyeth obtained and/or maintained monopoly power in the conjugated estrogen market; 2) whether Wyeth obtained or maintain its alleged monopoly power through anticompetitive conduct; 3) the definition of the relevant market; 4) whether Wyeth's alleged exclusive dealing contracts with PBM's and other entities are unreasonable restraints on trade and competition; 5) whether Wyeth's alleged anticompetitive conduct caused the class members to pay overcharges on Premarin; and 6) the appropriate measure of damages. Wyeth does not challenge the commonality requirement although it does contend that for purposes of Rule 23(b)(3) that individual issues will predominate over common issues.

According to the Sixth Circuit:

The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, we have said that there need only be one question common to the class. It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.

*Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998) (internal citation omitted). Although J.B.D.L. has identified a number of common issues, at a minimum it appears that whether Wyeth acquired and/or maintained a monopoly through anticompetitive means is an issue common to all members of the class and resolution of this issue would certainly advance the litigation. Accordingly, the Court concludes that this case satisfies the commonality requirement of Rule 23(a)(2).

### 3. Typicality and Adequacy of Representation

■ To satisfy the typicality requirement of Rule 23(a)(3), Plaintiff must establish

that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "Rule 23(a)(3) typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir.2000)(internal quotation marks omitted). In most cases, the commonality and typicality inquiries merge, "[b]oth serv[ing] as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir. 1998). In turn, the typicality and commonality requirements tend to merge with adequacy of representation requirement, although sometimes questions remain regarding competency of counsel and conflicts of interest. *Id.*

▮▮▮ To satisfy the requirement of Rule 23(a)(4), Plaintiff must establish that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). In assessing the adequacy of representation, the Court must consider whether Plaintiff shares sufficient common interests with class members and whether he or she will vigorously prosecute the interests of the class through qualified counsel. *See Senter,* 532 F.2d at 524–25; *Kutschbach,* 885 F.Supp. at 1085. In assessing the vigor of representation, the Court may consider the resources of the representative and his or her counsel and their ability to investigate claims and identify other class members. *See Kutschbach,* 885 F.Supp. at 1085; *Boggs v. Divested Atomic Corp.,* 141 F.R.D. 58, 66 (S.D.Ohio 1991).

Wyeth does not particularly contest the typicality requirement but does raise a number of challenges to the adequacy of J.B.D.L. as a class representative. Specifically, Wyeth argues that the class representative has conflicts of interest with other members of the class which make certifica-

tion inappropriate. First, Wyeth argues, there is conflict because thousands of entities in the proposed class have entered into market share incentive agreements, known as the Shared Success Plan, with Wyeth which, Wyeth contends, J.B.D.L. purports to condemn as illegal. Second, Wyeth claims there is a conflict of interest because the class representatives purchased Premarin not only directly from Wyeth, but also indirectly from wholesalers who are also members of the class. Thus, the alleged conflict arises because the class representatives will have purportedly paid overcharges on Premarin, which they now claim as damages, to other class members. Third, Wyeth contends that some class members purchased large quantities of Premarin at or below the wholesale acquisition cost ("WAC") just before price increases, held these supplies in inventory, and then sold at a higher price once the increase took effect. Thus, Wyeth argues, because of this practice, a conflict arises between the class representatives and some class members because some of the class members actually benefitted from Wyeth's price increases by being able to generate greater profits than they would have been able to absent the price increases.

Wyeth also argues that J.B.D.L. is an inadequate class representative because one executive for J.B.D.L. failed to recall that J.B.D.L. filed a motion to withdraw as class representative in another lawsuit and could not recall the status of yet another pending lawsuit in which J.B.D.L. is the class representative. Wyeth also argues that J.B.D.L. is an inadequate class representative because it has taken a position in one lawsuit that is inconsistent with its allegations in this lawsuit. Finally, Wyeth argues that the class representatives are inadequate because they have expressed reluctance to represent HMO's and PBM's who are also potential members of the class. The Court takes up these contentions seriatim.

### a. The Shared Success Plan

▮▮▮ Wyeth's Shared Success Plan paid pharmacies, i.e., direct purchasers, graduated rebates based on whether the pharmacy's market share on Premarin was above certain baselines which were tied to Wyeth's overall

market share on Premarin. *See, e.g.,* Doc. No. 32, Ordover Dec. Ex. 20. Wyeth recognizes that the complaint does not challenge the Shared Success Plan as being a violation of the antitrust laws, but claims that the Shared Success Plan is indistinguishable from the market share agreements with MCO's and PBM's which J.B.D.L. claims are illegal exclusive dealing contracts. *See id.* at 43 n. 37. Thus, Wyeth contends, a conflict arises between class representatives and pharmacies who participated in the Shared Success Plan because there are parties who benefitted from and claim harm from the same practice. J.B.D.L. contends that this argument is a red herring because it does not complain about the Shared Success Plan for the simple reason that the Shared Success Plan had no effect on the market.

The fact that J.B.D.L. does not contend that the Shared Success Plan is illegal is probably sufficient to find that there is no conflict between the class representatives and other class members who did participate in the plan. However, the Court agrees with J.B.D.L.'s analysis of the Shared Success Plan. Although perhaps indistinguishable in form, the Shared Success Plan and the alleged exclusive dealing contracts are distinguishable in effect, at least assuming the allegations about the alleged exclusive dealing contracts are true. As indicated above, the complaint alleges that the alleged exclusive dealing contracts artificially restricted demand for Cenestin and artificially kept Premarin at a supracompetitive price. Both parties' experts recognize, however, that the direct purchasing pharmacists' demand for Premarin is derivative, that is, dependent on the demand for Premarin further down the distribution chain. *See* Doc. No. 28, Rizzo Dec. ¶ 41; Doc. No. 32, Ordover Dec. ¶ 21. Because their demand is derivative, even Wyeth's expert, Dr. Janusz Ordover, admits that the direct purchasers have little or no ability to move market share. *See* Ordover Dec. ¶ 21; Ordover Dep., at 137–38. If the direct purchasers cannot affect market share, it stands to reason that Wyeth could not have used the Shared Success Plan to achieve or maintain an alleged monopoly in Premarin. In fact, because of their inability to move market share, of all the direct purchasers

who participated in the Shared Success Plan, only four to seven of them were able to increase their market share enough to receive rebates under the Plan. Ordover Dep. at 142–46.

In contrast, placement of a drug on a formulary does affect demand directly because it is offered to the patient at a lower price than non-formulary substitutes. Rizzo Dec. ¶ 42. If the drug is not on the formulary, or is on the formulary but not listed as a preferred drug, the patient will have to either pay full retail price for the drug or incur an increased co-payment for the drug. *Id.* Generally, however, if the substitutes are similar, the patient will choose the drug with a more favorable formulary status. *Id.* Thus, as alleged, Wyeth's agreements with PBM's making Premarin the exclusive conjugated estrogen on their formularies has the effect of shutting off demand for Cenestin and maintaining the price of Premarin at an artificially high level. *Id.* ¶ 40.

Consequently, we believe that because the effects of the Shared Success Plan are different from the effects of the alleged exclusive dealing agreements, there is no conflict between the class representatives and those class members who participated in the Shared Success Plan.

#### b. *Purchases from Wholesalers*

■ Wyeth next argues that the class representatives have conflicts with other members of the class because they purchased Premarin from other wholesalers who are potentially class members. The theory here is that the class representatives are conflicted with wholesalers they made purchases from because overcharges on Premarin would have been passed through to them by the wholesaler. As J.B.D.L. correctly points out, however, under the antitrust laws, indirect purchasers (which the class representatives would be if they purchased Premarin from wholesalers instead of Wyeth) cannot recover overcharges passed through to them by direct purchasers. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 728–29, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Therefore, this alleged conflict between the class representa-

tives and wholesalers they may have also purchased Premarin from is non-existent.

### c. *Class Members Profiting From Wyeth's Alleged Conduct*

■ Wyeth next argues that there is a conflict between the class representatives and some class members because some class members purchased large quantities of Premarin and were able to resell it at a greater profit after price increases. This argument is also without merit. Antitrust injury is considered complete when the direct purchaser pays an illegal overcharge and whether he was able to pass through the overcharge to indirect purchasers is irrelevant to the inquiry. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Illinois Brick*, 431 U.S. at 724–25, 97 S.Ct. 2061. Thus, as long as the price paid by the class members for Premarin was higher than it would have been absent the alleged anti-competitive conduct, there is no conflict created if indeed some of the direct purchasers were able to recoup the overcharge through price increases passed on to other purchasers.

In summary, the Court finds no conflict of interest issues which would make the named Plaintiffs inadequate representatives for the class.

### d. *Other Alleged Inadequacies*

Finally, Wyeth argues that the named Plaintiffs would be inadequate class representatives because one J.B.D.L. executive, Jay Weiner, could not remember J.B.D.L. withdrawing as class representative in another lawsuit, because J.B.D.L. has taken positions in other lawsuits inconsistent with its contentions here, and because J.B.D.L. has expressed reluctance to represent HMO's and PBM's, who are also potential class members. The Court finds none of these arguments to be persuasive.

■ To be an adequate representative, the named plaintiff must demonstrate a willingness and ability to play an active role in and control the litigation and to protect the absent class members. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001). In order to fulfill this obligation, the named plaintiff must possess a sufficient knowledge and understanding of the case that he may be said to be capable of controlling or prosecuting the litigation. *Id.; see also* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1766, at 308–10 (2nd ed.1986) ("If the representative displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied.") (internal footnotes omitted).

■ Initially, the Court believes that a single J.B.D.L. executive's inability to recall that J.B.D.L. withdrew as class representative in an earlier lawsuit has little or no bearing on whether J.B.D.L. is an adequate representative in this lawsuit. *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 368 (S.D.N.Y. 2000) (holding that to be relevant on the issue of adequacy, class representative's alleged misconduct must have nexus to present lawsuit with regard to time and subject matter). J.B.D.L. withdrew as class representative in the lawsuit referenced approximately one year before his deposition, Weiner Dep. at 142–43, so there was at least some passage of time which may account for Mr. Weiner's faulty memory. In any event, we think this single incidence of lack of recall does not make J.B.D.L. an inadequate class representative. The important inquiry is whether the class representative has a working knowledge of the instant action. *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 345 (S.D.Ga. 1996). Mr. Weiner satisfies this working knowledge requirement. Review of his deposition testimony shows that Mr. Weiner has a basic understanding of the legal theories in the complaint and the composition of the potential class members. *See* Weiner Dep. at 145–47. For instance, Mr. Weiner testified that he understood that Wyeth had agreements with PBM's to place Premarin on their formularies in a preferred status and that he believed that these agreements prevented Cenestin from competing with Premarin on an equal basis. *Id.* at 150–52. Mr.

Weiner also testified that he believed that in the absence of such agreements he would have purchased less Premarin and more Cenestin, and, as a consequence, would have incurred lower inventory costs. *Id.* at 268–70. This testimony is an accurate summation of the claims alleged in the complaint.

Wyeth also claims that the class representatives are inadequate because they expressed reluctance to represent HMO's and PBM's that are potential class members. Plaintiffs, however, have amended their class definition to exclude all HMO's and PBM's. Therefore, the issue of the class representatives' alleged hostility towards these entities is moot.

Finally, Wyeth contends that the class representatives are inadequate because they supposedly have taken positions regarding rebates in other lawsuits which were opposite from the stance they take here, i.e., in earlier lawsuits Plaintiffs sought rebates as a remedy whereas here they condemn a rebate scheme as being anticompetitive. Wyeth cites no case law supporting their argument that such action by the class representatives, if true, makes them inadequate to represent the class. Wyeth does not even state whether the claims in the earlier case arose under the antitrust laws, or were perhaps breach of contract actions. The Court simply has no basis upon which to assess the relevance of this contention. Accordingly, this argument is without merit.

In short, the record sufficiently demonstrates that the named Plaintiffs are adequate class representatives. They have no conflicts of interest with the other class members and possess sufficient knowledge of the claims and legal theories behind them to adequately protect the interests of the absent class members. Finally, although not challenged by Wyeth, the record shows the class counsel not only have extensive experience litigating class action lawsuits in general, but also have much experience litigating antitrust class action suits. *See generally* Doc. No. 28, Ex. A.

## 5. Conclusion

In summary, the Court finds that this case meets all the requirements of Rule 23(a).

### B. Rule 23(b)

Having satisfied the requirements of Rule 23(a), the inquiry becomes whether this case meets any of the requirements of Rule 23(b). Plaintiffs move to certify a class pursuant to Rule 23(b)(3), which requires the trial court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

It is here that the parties wage their most extensive battle on the issue of class certification, whether common issues predominate over individual issues or vice versa. The specific point of contention is whether Plaintiffs have a sound method for demonstrating class-wide impact of the alleged anticompetitive conduct or whether, as Wyeth contends, determining impact will devolve to analysis of many different individual contracts and negotiating strategies.

According to Plaintiff's expert, Dr. John Rizzo, there are a number of ways to prove through use of common evidence and methods of analysis that Wyeth's alleged anticompetitive conduct had a common impact on the class. According to Rizzo, these methods of proof include: 1) governmental and academic studies on the economic effects of the entry of competitor drugs, most of which conclude that purchasers derive substantial savings when less expensive, alternative drugs enter the market; 2) internal forecasts done by Wyeth and Duramed which predicted substantial market penetration of Cenestin, resulting in substantially lower prices to purchasers of oral conjugated estrogens; 3) standard microeconomic theory regarding monopoly pricing and the effect of entry of substantially similar competing products; and 4) the actual marketplace behavior of analogous branded drugs facing competition from substitutes. Doc. No. 28, Rizzo Dec. ¶ 44. Dr. Rizzo further states that the fact that some direct purchasers may have paid different prices for Premarin does not affect the common impact analysis because discounts are typically based on list prices

which were artificially inflated. *Id.* ¶ 45. As the Court understands this last statement, the fact that some direct purchasers may have purchased Premarin at a price achieved through individual negotiations does not affect the common impact analysis because Wyeth's alleged anticompetitive conduct artificially raised the base price for Premarin on which discounts were based. Thus, any variation in the price actually paid for Premarin by the sundry direct purchasers is really a matter of calculation of individual damages as opposed to evidence showing that impact of the alleged anticompetitive conduct was not common among direct purchasers. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3rd Cir.1977) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1781, at 8 (2nd ed.1986) ("[I]t uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate.").

Wyeth argues, however, that Dr. Rizzo's proposed methods of demonstrating class wide impact are fundamentally flawed and that it is clear that individual issues will predominate over common issues. First, Wyeth contends that Dr. Rizzo's assumption that all discounts are based on WAC is erroneous because some class members purchased Premarin at prices which were not linked to WAC or were negotiated individually. Therefore, according to Wyeth, because of these unlinked or individualized purchases, many class members may have purchased Premarin below the "but-for" price of Premarin Dr. Rizzo would attempt to establish through his methodologies, and thus have suffered no injury from the alleged anticompetitive conduct.

Initially, the Court notes that two of the entities Wyeth identifies as having purchased Premarin at prices not linked to WAC are HMO's or MCO's, that are not part of the proposed class. Therefore, their experience purchasing Premarin is not relevant to the common impact analysis. Dr. Rizzo plausibly responds, though, that it seems unlikely that Wyeth would conduct negotiations in complete disregard to and without some consideration of the list price of Premarin. *See* Doc. No. 38, Rizzo Dec., at 10 n.12. In other words, it is not logical to believe that in some cases Wyeth arbitrarily arrives at a price at which it agrees to sell Premarin. In any event, according to Dr. Rizzo, the record thus far demonstrates that the direct purchasers who allegedly purchase Premarin at prices unrelated to WAC is a small percentage of the entire class, and this fact does not defeat class certification. *Id.* ¶ 14; *In re Northwest Airlines Corp.*, 208 F.R.D. 174, 225 (E.D.Mich.2002) ("[I]t is not necessary, at the class certification stage, for Plaintiffs to show that each and every class member could satisfy an individualized standing inquiry."); *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 320–21 (E.D.Mich.2001) ("Even if Plaintiffs could not show injury-in-fact as to a few class members, this would not be fatal. The courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class."); *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322, 347 (E.D.Pa.1976) ("The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones."). Therefore, the Court concludes that even if, as Wyeth contends, some direct purchasers bought Premarin at prices unrelated to WAC, this does not mean that individual issues predominate over common issues.

Wyeth next argues that common impact for the class cannot be demonstrated for the period from March 24, 1999, when the FDA first approved Cenestin for sale, to May 12, 1999, when Duramed actually began selling Cenestin. Wyeth's theory apparently is that if Duramed had not placed Cenestin on the market, and therefore was unable to compete with Premarin anyway, then its alleged anticompetitive conduct would have had no effect on the class members. J.B.D.L., however, makes two persuasive arguments in rebuttal. First, J.B.D.L. points out that according to Dr. Rizzo, economic theory accepts the prem-

ise that firms are typically forward-looking and therefore it is reasonable to believe that Wyeth would have begun engaging in anticompetitive behavior in advance of Cenestin's actual entry into the marketplace. *See* Doc. No. 38, Rizzo Dec. ¶ 23. Even Wyeth's expert, Dr. Ordover, agrees that firms make changes in list prices based on anticipated future market conditions. *See* Ordover Dec. ¶ 16. Thus, J.B.D.L.'s theory that Wyeth engaged in anticompetitive conduct during the period between Cenestin's FDA approval and its placement on the market is not unreasonable. Second, J.B.D.L. points to evidence adduced thus far that shows Wyeth did in fact make plans for Cenestin's entry into the market even in advance of the FDA's approval of Cenestin. *See* Ordover Dec. Ex. 40 ("Premarin Preemptive Plan, February 11, 1999"). The goal of the "Premarin Preemptive Plan" was to "hold Cenestin to <2% of Trx share in 1999" by "limit[ing] contracting opportunities" through "enforc[ing] preferred brand status," *see id.*, or, in other words, to engage in some of the conduct alleged in this case to be anticompetitive. Consequently, one might infer that the class was impacted by the alleged anticompetitive conduct prior to Cenestin's market debut. In any event, Wyeth's argument here does not seem to compel a finding that individual issues will predominate over common ones so much as it supports amending the class period to begin on May 12, 1999 rather than March 24, 1999. Whether the class definition should be so amended, however, is a question the Court leaves for another day.

Wyeth next contends that common impact cannot be demonstrated for direct purchasers who bought Premarin in dosage strengths not offered by Cenestin. The theory here is that Wyeth's alleged exclusive dealing contracts could not have affected competition on dosage strengths not offered for Cenestin. J.B.D.L., however, has adduced evidence which demonstrates that the price for Premarin at all dosage strengths was tied to the price of the best selling dosage, .625 mg, for which Cenestin had an equivalent. Doc. No. 38, Rizzo Dec. ¶ 24. Thus, to the extent that J.B.D.L. could show that the price of Premarin dosages were indexed to the price of the .625 mg dose, and that the .625 mg dose was priced at a supracompetitive level, the impact of the alleged anticompetitive conduct would be common to purchasers across all dosage levels of Premarin.

Wyeth next devotes much argument attempting to show that Dr. Rizzo's various proposed methods of proving class-wide impact are invalid. Of course, the Court's task is not to determine whether any of Dr. Rizzo's theories are ultimately meritorious but rather whether they are "colorable" and not "fatally flawed." *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 135 (2nd Cir.2001). In light of the above discussion regarding Wyeth's arguments directed towards Plaintiffs' ability, or lack thereof, to show impact on a class-wide basis, it appears that at a minimum Plaintiffs have presented colorable methods for demonstrating common impact. In other words, whatever their actual merits, the Court does not find Dr. Rizzo's proposed methodologies to be fatally flawed.

Finally, Wyeth argues that individual issues will predominate because exclusive dealing contracts must be analyzed under the rule of reason, thus entailing scrutiny of each contract with each MCO or each PBM. *E.g. Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The Court disagrees. J.B.D.L.'s theory is not that a single contract, taken in isolation, is anticompetitive, as was the allegation in *Tampa Electric*. Rather, J.B.D.L.'s theory is that Wyeth's policy of entering into exclusive dealing contracts with PBM's, *as a whole*, had the effect of foreclosing Cenestin from the market and establishing the price of Premarin at a supracompetitive level. *See* Doc. No. 38, at 36. Thus, the intricacies of the individual contracts are not important so long as each of them incentivized PBM's to exclude Cenestin from their formularies. Therefore, the Court does not find this argument to be persuasive.

In short, the Court finds that Plaintiffs have demonstrated a colorable method for demonstrating class-wide impact and that common issues will predominate over individual issues.

220

Wyeth next argues that Plaintiffs have not satisfied Rule 23(b)(3) because a class action is not a superior method to adjudicate these claims. Wyeth argues that this class action would be unmanageable, but as J.B.D.L. observes, this argument is mostly a recapitulation of its argument that individual issues will predominate over common issues. Having addressed these issues once, the Court will not do so again. Wyeth also argues that a class action is not superior because most of the liability issues will have been resolved in *Duramed v. Wyeth–Ayerst Laboratories, Inc.*, C–1–00–735 (S.D.Ohio), thus leaving only individual issues regarding impact and damages. The *Duramed* case, however, settled before any of the merits of that case were addressed, making this argument moot. Finally, Wyeth argues that a class action is not superior because the class contains large, sophisticated entities who are capable of bringing their own claims. However, as J.B.D.L. points out, the presence of large claimants in the class does not make a class action an inferior method of adjudicating the case. *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 325 (E.D.Mich. 2001).

Among the factors provided by Rule 23(b)(3) for determining whether a class action is superior to individual actions, the trial court should consider:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). In consideration of these factors, the Court notes that there does not appear to be any widespread interest among class members in controlling their own actions, but to the extent that class members do have such interest they retain the ability to opt out of the class. Of course, if a sufficient number of class members do elect to opt out in order to pursue their own claims, then the class could be decertified if the numerosity requirement is no longer satisfied. *E.g., Davis v. Roadway Express, Inc.*, 590 F.2d 140, 144 & 144 n. 4 (5th Cir.1979); *Thonen v. McNeil–Akron, Inc.*, 661 F.Supp. 1271, 1275 (N.D.Ohio 1986). The Court has not been made aware that other cases contesting the legality of Wyeth's contracting practices are pending in other fora. In addition to saving the class members the costs of pursuing their individual claims, as J.B.D.L. points out, Wyeth would appear to benefit from class certification because it would resolve in one setting many issues surrounding its contracts with PBM's. Finally, the Court has not been made aware of any peculiar management difficulties this case presents as a class action.

Accordingly, the Court concludes that this case meets the requirements of Rule 23(b)(3).

### C. The Class Definition

Finally, Wyeth argues that the Court should not grant the motion for class certification because Plaintiffs have not presented a "workable" class definition. However, as the Court reviews this argument, it is based on the notion that the class representatives have conflicts of interest with other class members and/or that there is no method for demonstrating class-wide impact of the alleged anticompetitive conduct. The Court has already addressed and disposed of these arguments. Moreover, Plaintiffs have amended their class definition to exclude the entities with whom they allegedly have conflicts of interest. Accordingly, the Court does not find that Plaintiffs' class definition is unworkable.

### Conclusion

In conclusion, Plaintiffs' motion for class certification is well-taken and is **GRANTED**. The Court certifies a class consisting of:

All persons and entities who purchased or purchase Premarin in the United States directly from Wyeth–Ayerst Laboratories, Inc. at any time during the period from March 24, 1999 through the present, excluding Wyeth–Ayerst Laboratories, Inc. and its officers, directors, management employees, corporate parents, subsidiaries,

221

and/or affiliates, federal governmental entities, pharmacy benefits managers, and/or managed care organizations who purchased Premarin directly from Wyeth–Ayerst Laboratories, Inc.

Finally, having reviewed Wyeth's supplemental brief (Doc. No. 45) we believe that it delves too extensively into the merits of Plaintiffs' proposed methodologies for demonstrating class-wide impact for consideration on a motion for class certification. Therefore, the Wyeth's motion to file a supplemental brief (Doc. No. 45) is not well-taken and is **DENIED**.

**IT IS SO ORDERED.**